REVISED DECEMBER 15, 2008

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 25, 2008

Charles R. Fulbruge III
Clerk

No. 07-30580

BOARD OF SUPERVISORS FOR LOUISIANA STATE UNIVERSITY
AGRICULTURAL AND MECHANICAL COLLEGE; BOARD OF REGENTS
OF THE UNIVERSITY OF OKLAHOMA; OHIO STATE UNIVERSITY;
UNIVERSITY OF SOUTHERN CALIFORNIA

                              Plaintiffs-Appellees

v.

SMACK APPAREL CO; WAYNE CURTISS

                              Defendants-Appellants

Cons. w/ No. 07-30887

BOARD OF SUPERVISORS FOR LOUISIANA STATE UNIVERSITY
AGRICULTURAL AND MECHANICAL COLLEGE; BOARD OF REGENTS
OF THE UNIVERSITY OF OKLAHOMA; OHIO STATE UNIVERSITY;
UNIVERSITY OF SOUTHERN CALIFORNIA; COLLEGIATE LICENSING
COMPANY

                              Plaintiffs-Appellants

v.

SMACK APPAREL CO; WAYNE CURTISS

                              Defendants-Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

No. 07-30580
c/w No. 07-30887

Before REAVLEY, STEWART, and OWEN, Circuit Judges.

REAVLEY, Circuit Judge:

These consolidated appeals concern a trademark dispute between four universities and an apparel company and its principal. The Universities alleged in the district court that the defendants violated the Lanham Act and infringed their trademarks by selling t-shirts with the schools' color schemes and other identifying indicia referencing the games of the schools' football teams. The district court granted summary judgment to the Universities for trademark infringement and conducted a jury trial as to damages, with the jury returning a verdict favoring the plaintiffs. The defendants appeal the summary judgment order, and the Universities appeal the district court's denial of their post-verdict motion for attorneys' fees. We conclude that the colors, content, and context of the offending t-shirts are likely to cause confusion as to their source, sponsorship, or affiliation, and we AFFIRM.

I. Background

The plaintiffs are Louisiana State University (LSU), the University of Oklahoma (OU), Ohio State University (OSU), the University of Southern California (USC), and Collegiate Licensing Company (CLC), which is the official licensing agent for the schools.[1] The defendants are Smack Apparel Company and its principal, Wayne Curtiss (collectively Smack).

Each university has adopted a particular two-color scheme as its school colors (purple and gold for LSU, crimson and creme for OU, scarlet and gray for OSU, and cardinal and gold for USC). The Universities have used their respective color combinations for over one hundred years, and the color schemes

---

[1] The Pasadena Tournament of Roses was also a plaintiff in the district court, but it was dismissed upon joint motion of the parties and is not part of the instant appeal.

2

are immediately recognizable to those who are familiar with the Universities. The schools use these color schemes in many areas associated with university life, including on campus signs and buildings, on printed brochures, journals, and magazines, and on materials sent to potential donors. The Universities also use the color schemes extensively in connection with their athletic programs, particularly on team uniforms, resulting in wide-spread recognition of the colors among college sports fans. Each university operates a successful collegiate football program, and the respective football teams have appeared on numerous occasions in nationally televised football games that have been viewed by millions of people.

The schools also grant licenses for retail sales of products, including t-shirts, that bear the university colors and trademarks. In recent years, the total annual sales volume of products bearing the school colors along with other identifying marks has exceeded $93 million for all the Universities combined. The Universities hold registered trademarks in their respective names and commonly used initials. They do not, however, possess registered trademarks in their color schemes.

Smack Apparel Company is located in Tampa, Florida. Since 1998 Smack has manufactured t-shirts targeted toward fans of college sports teams, and it uses school colors and printed messages associated with the Universities on its shirts. Smack sells some of the shirts over the Internet, but most are sold wholesale to retailers and t-shirt vendors. The shirts frequently appear alongside those that have been officially licensed by the Universities. The instant case involves six of Smack's t-shirt designs that concern the appearance of the OU and LSU football teams in the 2004 Sugar Bowl in New Orleans, Louisiana, and the number of national championships previously won by OSU and USC. The district court described these Smack shirt designs as follows:

• OU (2 shirt designs): (1) "Bourbon Street or Bust" (with the "ou" in "Bourbon" in a different typestyle) (front), "Show us your beads!" (with the "ou" in "your" in a different typestyle) and "Sweet as Sugar!" (back) (2) "Beat Socal" (front), "And Let's Make it Eight!" (back). These shirts refer to 2004 Sugar Bowl contest in New Orleans between the OU and LSU football teams. A victory in the Sugar Bowl could have given OU a claim to an eighth national football championship. One of OU's principal rivals to this claim was USC.

• LSU (2 shirt designs): (1) "Beat Oklahoma" (front), "And Bring it Back to the Bayou!" and "2003 College Football National Championship" (back) (2) "2003 College Football National Champions" (front), colored circular depiction of game scores, with "2003 College Football National Champions" and "Sweet as Sugar" (back). These shirts refer to the 2004 Sugar Bowl contest in New Orleans between OU and LSU, which was played to determine the Bowl Championship Series national football champion.

• OSU: "Got Seven?" (front), "We do! 7 Time National Champs," with depiction of the state of Ohio and a marker noting "Columbus Ohio" (back). This shirt refers to the seven college football national titles claimed by OSU.

• USC: "Got eight?" (front), "We Do! Home of the 8 Time National Champions!" and depiction of the state of California with a star marked "SoCal" (back). This design refers to USC's claim to eight college national football championships.

Bd. of Supervisors of LA State Univ. v. Smack Apparel Co.[2] In addition to the messages described above, each shirt included Smack's own logo in a space approximately 2.5 inches wide and the words "Talkin' the Talk."

The Universities sued Smack, alleging that the above six shirt designs infringed their trademark rights. The Universities alleged causes of action for federal trademark infringement and dilution, unfair competition, and deceptive

---

[2] 438 F. Supp. 2d 653, 655 (E.D. La. 2006).

trade practices under the Lanham Act, 15 U.S.C. §§ 1051–1141n; unfair trade practices under the Louisiana Unfair Trade Practices and Consumer Protection Act (LUTPA), LA. REV. STAT. § 51:1409; common law trademark infringement and unfair competition; and state trademark dilution. The plaintiffs alleged that each schools' color combination acts as a source-identifier for the respective schools, especially when used in connection with other indicia identifying or suggesting the schools. They alleged that Smack's shirts infringed their unregistered trademarks by "combining Plaintiffs' Marks with references to, inter alia, . . . (a) well-known and highly-publicized athletic events in which a University participated; (b) a University's opponent in the referenced athletic event; (c) the geographic area in which the referenced event takes place; (d) titles and honors bestowed as a result of the referenced athletic event; (e) a University's earlier athletic successes and accomplishments; and (f) the geographic area in which the University is located or associated."

The Universities claimed that Smack's products are similar to and competed with goods sold or licensed by the Universities and are sold directly alongside merchandise authorized by the plaintiffs at or near events referenced in the shirts. In this way, according to the Universities, the sale of Smack's products is likely to deceive, confuse, and mislead consumers into believing that Smack's products are produced, authorized, or associated with the plaintiff Universities. The Universities sought injunctive relief, lost profits, damages, costs, and attorneys' fees.

The parties filed cross-motions for summary judgment on the issue of liability for trademark infringement. The district court granted summary judgment for the Universities, holding that the Universities' trademarks in their color schemes, logos, and designs on shirts referring to the schools or their

accomplishments had acquired secondary meaning.[3]   The district court concluded that the marks were strong, having been used for decades as a reference to the Universities, and that Smack's infringing shirts were likely to cause confusion as to the source, affiliation, or sponsorship of the shirts.[4]  The district court found that the marks at issue were virtually identical.  The court reasoned that Smack used the same color schemes and similar logos and designs as the plaintiffs; that Smack marketed and sold its shirts in a manner similar to the Universities' products and sometimes alongside those of the Universities; and that Smack used the color schemes, logos, and designs with the specific intent to rely upon their drawing power in enticing fans of the Universities to purchase its shirts.[5]  The court noted that Smack admitted using the school colors and other indicia with the intent of identifying the Universities as the subject of the message in the shirt designs.[6]  The court also noted that a likelihood of confusion existed because the shirts, which are relatively inexpensive, are not purchased with a high degree of care by consumers.[7]  The district court rejected Smack's defenses of functionality, nominative fair use, and laches.[8]

After deciding the liability issue, the district court conducted a jury trial on the issue of damages.  Smack moved for judgment as a matter of law, arguing that there could be no actual damages because there had been no actual

---

[3] Id. at 657–58.

[4] Id. at 658–61.

[5] Id.

[6] Id. at 661.

[7] Id.

[8] Id. at 661–63.

confusion. The district court denied the motion. The jury then returned a verdict in favor of the plaintiffs and answered special interrogatories finding that Smack's "infringement caused actual confusion of the public or caused the public to be deceived." The jury awarded the Universities actual damages of $10,506.80 and lost profits of $35,686. The district court also enjoined Smack from manufacturing, distributing, selling, or offering for sale any of the six t-shirt designs found to be infringing or any other similar designs.

## II. Discussion

We review a district court's grant of summary judgment de novo. Noble Energy, Inc. v. Bituminous Cas. Co.[9] Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[10] "No genuine issue of material fact exists if the summary-judgment evidence is such that no reasonable juror could find in favor of the nonmovant." Jenkins v. Methodist Hosps. of Dallas, Inc.[11] Although the secondary meaning of a mark and the likelihood of confusion are ordinarily questions of fact, Elvis Presley Enterprises, Inc. v. Capece,[12] summary judgment may be upheld if the summary judgment record compels the conclusion that the movant is entitled to judgment as a matter of law. Beef/Eater Rests., Inc. v. James Burrough Ltd.[13]

---

[9] 529 F.3d 642, 645 (5th Cir. 2008).

[10] FED. R. CIV. P. 56(C).

[11] 478 F.3d 255, 260 (5th Cir.), cert. denied, 128 S. Ct. 181 (2007).

[12] 141 F.3d 188, 196 (5th Cir. 1998).

[13] 398 F.2d 637, 639 (5th Cir. 1968).

To prevail on their trademark infringement claim, the plaintiffs must show two things. First, they must establish ownership in a legally protectible mark, and second, they must show infringement by demonstrating a likelihood of confusion. Am. Rice, Inc. v. Producers Rice Mill, Inc.[14] Smack argues first that the district court erroneously found no genuine issue of fact whether there are legally protectible marks at issue in this case.

## A. Protectible trademark and secondary meaning

The Lanham Act provides that a trademark may be "any word, name, symbol, or device, or any combination thereof" that is used or intended to be used "to identify and distinguish" a person's goods "from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."[15] A mark need not be registered in order to obtain protection because "[o]wnership of trademarks is established by use, not by registration." Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin.[16] The marks at issue in this case are unregistered, and, as noted by the district court, were described by the Universities as "color schemes in the context of merchandise that makes reference to the Plaintiff Universities or their accomplishments and is directed to their fans and other interested consumers."[17]

The protectibility of unregistered marks is governed generally by the same principles that qualify a mark for registration under the Lanham Act. Two

---

[14] 518 F.3d 321, 329 (5th Cir. 2008); see also Elvis Presley Enters., 141 F.3d at 194 (noting "the threshold requirement that the plaintiff must possess a protectible mark, which must be satisfied before infringement can be actionable").

[15] 15 U.S.C. § 1127.

[16] 909 F.2d 839, 842 (5th Cir. 1990).

[17] See Bd. of Supervisors, 438 F. Supp. 2d at 657 (quotation marks and citation omitted).

Pesos, Inc. v. Taco Cabana, Inc.[18] The key is whether the mark is "capable of distinguishing the applicant's goods from those of others."[19] Marks are generally classified as (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful.[20] The parties here do not articulate a classification for the marks at issue, but the briefs show that they, and indeed the district court, have treated the marks as descriptive. This type of mark is not inherently distinctive because it does not inherently identify a particular source of the product; instead, it requires secondary meaning to be protected under the Lanham Act.[21]

The parties correctly agree that a color scheme can be protected as a trademark when it has acquired secondary meaning and is non-functional. Qualitex Co. v. Jacobson Prods. Co.[22] Although the parties discuss color at length in their briefs, the Universities do not claim that every instance in which their team colors appear violates their respective trademarks. Instead, the claimed trademark is in the colors on merchandise that combines other identifying indicia referring to the Universities. It is appropriate therefore to consider not only the color but also the entire context in which the color and other indicia are presented on the t-shirts at issue here.

Smack contends that the claimed marks are too broad to encompass a trademark because the concept of color along with other identifying indicia is not distinctive. We disagree. As noted, the statute contemplates that a trademark

---

[18] 505 U.S. 763, 768, 112 S.Ct. 2753, 2757 (1992).

[19] Id.

[20] Id.

[21] Id. at 769, 112 S. Ct. at 2757.

[22] 514 U.S. 159, 163–64, 115 S. Ct. 1300, 1303–04 (1995).

may include any word, name, or symbol "or any combination thereof."[23] The Supreme Court has recognized that the Lanham Act describes the universe of permissible marks "in the broadest of terms."[24] Because the Court recognizes that trademarks may include color, we see no reason to exclude color plus other identifying indicia from the realm of protectible marks provided the remaining requirements for protection are met. Thus, the first step here is to ask whether the Universities' claimed marks have acquired secondary meaning.

Secondary meaning "occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" Wal-Mart Stores, Inc. v. Samara Bros., Inc.[25] The inquiry is one of the public's mental association between the mark and the alleged mark holder. Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.[26] A mark has acquired secondary meaning when it "has come through use to be uniquely associated with a specific source." Pebble Beach Co. v. Tour 18 I Ltd.[27] We have applied a multi-factor test for determining secondary meaning. The factors include: "(1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct

---

[23] 15 U.S.C. § 1127 (emphasis added).

[24] Qualitex, 514 U.S. at 162, 115 S. Ct. at 1302.

[25] 529 U.S. 205, 211, 120 S. Ct. 1339, 1343 (2000) (citation omitted).

[26] 791 F.2d 423, 427 (5th Cir. 1986) ("[T]he prime element of secondary meaning is 'a mental association in buyers' minds between the alleged mark and a single source of the product.'" (citation omitted)).

[27] 155 F.3d 526, 536 (5th Cir. 1998) (internal quotation marks omitted), abrogation on other grounds recognized by Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH, 289 F.3d 351, 356 (5th Cir. 2002).

consumer testimony, and (7) the defendant's intent in copying the trade dress."[28] These factors in combination may show that consumers consider a mark to be an indicator of source even if each factor alone would not prove secondary meaning.[29]

There is no dispute in this case that for a significant period of time the Universities have been using their color schemes along with other indicia to identify and distinguish themselves from others. Smack admits in its brief that the Universities' colors are well known among fans "as a shorthand nonverbal visual means of identifying the universities." But according to Smack, the longstanding use of the school colors to adorn licensed products is not the same as public recognition that the school colors identify the Universities as a unique source of goods. We think, however, that the factors for determining secondary meaning and an examination of the context in which the school colors are used and presented in this case support the conclusion that the secondary meaning of the marks is inescapable.

The record shows that the Universities have been using their color combinations since the late 1800s.[30] The color schemes appear on all manner of materials, including brochures, media guides, and alumni materials associated with the Universities. Significantly, each university features the color schemes on merchandise, especially apparel connected with school sports teams, and such prominent display supports a finding of secondary meaning.[31] The record also

---

[28] Pebble Beach, 155 F.3d at 541.

[29] Id.

[30] OSU adopted its school colors in 1878, while LSU has been using its colors since 1893, and OU and USC since 1895.

[31] See Pebble Beach, 155 F.3d at 541–52 (prominent display of golf hole's trade dress in advertising supported finding of secondary meaning as a designator of source).

11

shows that sales of licensed products combining the color schemes with other references to the Universities annually exceed the tens of millions of dollars.[32] As for advertising, the district court held that the Universities "advertise items with their school colors in almost every conceivable manner . . . ."[33] It is not clear from the summary judgment evidence where and how the Universities advertise their merchandise, but they certainly do use their color schemes and indicia in numerous promotional materials aimed at students, faculty, alumni, and the public in general, which strengthens the conclusion that the color schemes and indicia viewed in context of wearing apparel also serves as an indicator of the Universities as the source or sponsor of the apparel. Furthermore, the district court correctly observed that the school color schemes have been referenced multiple times in newspapers and magazines and that the schools also frequently refer to themselves using the colors.[34] The district court did not specifically refer to any consumer-survey evidence or direct consumer testimony, but it noted that Smack admitted it had incorporated the Universities' color schemes into its shirts to refer to the Universities and call them to the mind of the consumer. Thus, Smack itself believed that the Universities' color schemes had secondary meaning that could influence consumers, which further supports the conclusion that there is secondary meaning here.[35] Given the longstanding

---

[32] For example, LSU sells between $10 and $20 million worth of goods each year, while the annual sales volume for the other schools is approximately $13 million for USC, $20 million for OU, and $50 million for OSU.

[33] Bd. of Supervisors, 438 F. Supp. 2d at 658.

[34] For example, LSU and third parties have referred to that university as the "Purple and Gold."

[35] See also Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 663 (7th Cir. 1995). We also note that the record does contain survey evidence compiled by the Universities indicating that approximately thirty percent of consumers interviewed believed two of Smack's t-shirts were produced or sponsored by the Universities. We have indicated that survey

use of the color scheme marks and their prominent display on merchandise, in addition to the well-known nature of the colors as shorthand for the schools themselves and Smack's intentional use of the colors and other references, there is no genuine issue of fact that when viewed in the context of t-shirts or other apparel, the marks at issue here have acquired the secondary meaning of identifying the Universities in the minds of consumers as the source or sponsor of the products rather than identifying the products themselves.

We think this conclusion is consistent with the importance generally placed on sports team logos and colors by the public. We have previously noted, although not in the context of secondary meaning, that team emblems and symbols are sold because they serve to identify particular teams, organizations, or entities with which people wish to identify. See Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.[36] We think this desire by consumers to associate with a particular university supports the conclusion that team colors and logos are, in the minds of the fans and other consumers, source indicators of team-related apparel. By associating the color and other indicia with the university, the fans perceive the university as the source or sponsor of the goods because they want to associate with that source.

Smack argues that because photographs of businesses near the campuses of the Universities show use of school colors by those businesses, consumers in college towns merely associate school colors with "support of the home team." Smack cites no authority or supporting evidence for its contention, however.

---

evidence often may be the most direct and persuasive evidence of secondary meaning. Sugar Busters LLC v. Brennan, 177 F.3d 258, 269 (5th Cir. 1999). Nevertheless, Smack moved in limine to exclude the Universities' survey evidence, and the district court found it unnecessary to rule on the motion because of the other evidence in the record. Because no party has raised the issue, we express no opinion on the correctness of the district court's belief and merely note the presence of the survey evidence in the record.

[36] 510 F.2d 1004, 1011 (5th Cir. 1975).

Moreover, the fact that other businesses in college towns may use the same colors as a local university does not create an issue of fact as to the secondary meaning of the colors used in merchandise that the Universities indisputably produce, especially given Smack's admission of intentional use of the colors to influence consumers.

Smack also argues that because the Universities grant licenses to many licensees, a consumer may not identify a university as the single source of the product. The fact that the Universities may grant licenses to many licensees to sell authorized products does not negate the fact that the schools are still the sources of the marks.[37] We conclude that the record establishes secondary meaning in the marks here.

## B. Likelihood of confusion

Once a plaintiff shows ownership in a protectible trademark, he must next show that the defendant's use of the mark "creates a likelihood of confusion in the minds of potential customers as to the 'source, affiliation, or sponsorship'" of the product at issue. Westchester Media v. PRL USA Holdings, Inc.[38] "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion."[39] When assessing the likelihood of confusion, we consider a nonexhaustive list of so-called "digits of confusion," including: "(1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used,

---

[37] Cf. Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1121 (5th Cir. 1991) ("An owner may license its trademark or trade dress and retain proprietary rights if the owner maintains adequate control over the quality of goods and services that the licensee sells with the mark or dress.").

[38] 214 F.3d 658, 663 (5th Cir. 2000) (citation omitted).

[39] Id. at 663–64.

(6) the defendant's intent, and (7) any evidence of actual confusion."[40]  Courts also consider (8) the degree of care exercised by potential purchasers.[41] No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors.[42]

Smack argues that there were genuine issues of material fact whether its t-shirt designs were likely to cause confusion among consumers.  We disagree. The first digit, the type of mark, refers to the strength of the mark.[43]  Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark.[44]  We agree with the district court that the plaintiffs' marks, which have been used for over one hundred years, are strong.[45]  As noted above, Smack concedes that the Universities' color schemes are well-known and are used to identify the plaintiff Universities.  It argues, however, that the district court disregarded evidence of third-party use of the Universities' team colors in a non-trademark manner, and it cites Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Association[46] in support of its argument.

In Sun Banks, we held that "extensive" third-party use can weaken a mark and negate a likelihood of confusion.[47]  In that case there were "over 4400

---

[40] Id. at 664.

[41] Am. Rice, 518 F.3d at 329.

[42] Id.

[43] Elvis Presley Enters., 141 F.3d at 201.

[44] Id.

[45] See Bd. of Supervisors, 438 F. Supp. 2d at 659.

[46] 651 F.2d 311 (5th Cir. 1981)

[47] Sun Banks, 651 F.2d at 316.

businesses" in Florida that were using the word "Sun" in their names, and we noted that "a significant number" fell within the same category of financial institutions as the plaintiff.[48]

Smack presented photographs of three businesses in Louisiana, eight businesses in Ohio, and approximately 20 businesses in Oklahoma that incorporated in their signage color schemes similar to the school colors of LSU, OSU, and OU, respectively. The businesses included several restaurants and bars, a driving school, a pain management clinic, a theater, a furniture store, a dry cleaners, a motel, a donut shop, an apartment complex, and a car care company. All third-party use of a mark, not just use in the same industry as a plaintiff, may be relevant to whether a plaintiff's mark is strong or weak.[49] But the key is whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff—surely lacking where colors are shown on a store wall. See Univ. of Ga. Athletic Ass'n v. Laite.[50] Smack's evidence falls far below that of extensive use, and the specific photographs of third-party use here fail to create an issue of fact concerning the public's association between the plaintiffs and color schemes and other indicia that clearly reference the Universities. We conclude that the Universities possess strong marks in their use of color schemes and other identifying indicia on college sports-themed merchandise.

---

[48] Id.

[49] Union Nat'l Bank of Tex., 909 F.2d at 848 n.24; see also 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:88 (4th ed.) ("[E]vidence of extensive third party use on a wide range of goods and services does tend to weaken strength and narrow the scope of protection.").

[50] 756 F.2d 1535, 1545 n.27 (11th Cir. 1985).

The second digit is the similarity of the marks. This factor requires consideration of the marks' appearance, sound, and meaning.[51] The district court held that the marks at issue are virtually identical.[52] Smack argues that there was no evidence that any of its shirts were identical to any shirts licensed by the Universities and that its t-shirt designs are not at all similar to any of the Universities' licensed products. Smack's contention is belied by the record, and even a cursory comparison of Smack's designs with the plaintiffs' licensed products reveals striking similarity.[53]

For example, one of Smack's shirt designs in purple and gold is referred to as the "sundial" shirt and was targeted toward LSU fans. The front of the shirt proclaims "2003 National Champions," and the back contains the scores from twelve games won by LSU. The scores are arranged in a circle with a short phrase poking fun at each opponent. The shirt also contains the final score of the 2004 Sugar Bowl, which LSU won, and the phrase "Sweet as Sugar!" Although the shirt does not use the initials "LSU" anywhere, its identification of LSU as the national champion is unmistakable from the colors and from the references to the games in which LSU played. This shirt is strikingly similar to LSU's own merchandise that also uses the purple and gold colors and proclaims LSU as the national champion. Several of the official designs contain the scores of the games from LSU's season and at least two designs present those scores in a circular arrangement. The official designs also contain the phrases "Ain't It Sweet!" and "Pour It On!"

---

[51] Elvis Presley Enters., 141 F.3d at 201.

[52] Bd. of Supervisors, 438 F. Supp. 2d at 659–60.

[53] See Beef/Eater Rests., 398 F.2d at 639 ("[T]he trial judge, by inspection of the trademarks, may himself determine, and must determine, the likelihood of confusion.").

Another Smack shirt directed at LSU fans is the "Beat Oklahoma" shirt. It states, "Bring it Back to the Bayou." This is very similar to two official designs that state in part "Bring It Home" and "We'll Have Big Fun on the Bayou."

The evidence of similarity is not limited to the shirts targeted toward LSU fans. For example, the "Bourbon Street or Bust!" shirt directed at OU fans highlights the letters "OU" in a different type face in the words "Bayou" and "your." It also states "Sweet as Sugar," references beads, and contains a picture of a mardi gras mask. OU presented evidence of official t-shirt designs that also highlight the letters "OU," contain phrases such as "Ain't Nothin' Sweeter" and "100% Pure Sugar," and contain depictions of mardi gras masks and beads. Another Smack OU design encourages, "Let's Make it Eight," while official designs proclaim "Sugar is Sweet But . . . 8 is Great!"

In the district court, Smack presented the affidavit of its principal, Wayne Curtiss, who explained that Smack uses humor and creative language to distinguish its t-shirt designs from those of the purportedly more conservative licensed or school-endorsed apparel. Curtiss asserted that the "got seven?" and "got eight?" shirts directed toward OSU and USC fans, respectively, are parodies of the "got milk" campaign. He further averred that he has used a similar design on shirts for LSU and OU fans. It is clear from the record, however, that use of creative language is not unique to Smack and does not make Smack's shirts dissimilar to the Universities' own products. For example, LSU presented evidence of a school-endorsed design that included the phrase "got sugar?" We conclude that Smack's shirts and the Universities' products are similar in look, sound, and meaning, and contain very similar color schemes, words, and images. The similarities in design elements are overwhelming and weigh heavily in favor

of a likelihood of confusion.  The district court correctly held there is no genuine issue of material fact with respect to this digit of confusion.[54]

The third digit in the likelihood of confusion analysis is the similarity of the products or services.  We disagree with Smack's assertion that the district court did not find a great deal of similarity between the plaintiffs' products and the t-shirts at issue, as the district court specifically held that "[i]t is undisputed that both Smack and the universities market shirts bearing the same color schemes, logos, and designs."[55]  The district court went on to reject Smack's argument that its t-shirts differed from the Universities' products because of the use of irreverent phrases or slang language, reasoning that Smack's use of such phrases and language was a misuse of the Universities' good will in its marks. Smack denies that it appropriated the Universities' good will, but it does not make an argument here that its shirts are distinguishable from those of the Universities because of particular language on its shirts.  We therefore find this factor weighs in favor of a likelihood of confusion.

Smack concedes that the fourth factor of the analysis–identity of retail outlets and purchasers–weighs in favor of a likelihood of confusion because the Universities' licensed products are often sold wholesale to the same retailers who purchase Smack's products.

The fifth digit is the identity of advertising media.  The district court found that Smack used the Universities' color schemes, logos, and designs in

---

[54] Because we conclude that there is no issue of fact as to the similarity of the use of the marks in the t-shirt designs, we need not consider Smack's contention that the district court erroneously stated there had been instances where consumers actually believed Smack's shirts were affiliated with or sponsored by the Universities.  Smack points to a stipulation by the parties at the summary judgment stage that there was no evidence any consumer purchased a Smack shirt believing it to be licensed by one of the Universities.  Actual confusion on the part of a consumer is not required to find a likelihood of confusion, however.  Elvis Presley Enters., 141 F.3d at 203.

[55] Bd. of Supervisors, 438 F. Supp. 2d at 660.

advertising its shirts at the same or similar venues as those used by the Universities.[56]   The court based its finding on Smack's admission that it participated in the same trade shows as the Universities and that it displayed its shirts at the trade shows.  The Universities do not point us to evidence that trade shows are a significant advertising channel for the kinds of products at issue in this case.  Although the t-shirts are sold to the public at the same retail outlets as officially licensed merchandise, Curtiss testified that beside limited sales on Smack's web site, Smack does not sell directly to the public and does not advertise.  Curtiss testified that Smack sells mainly to wholesalers.  Some of these wholesalers may include Smack's shirts in advertisements that promote their own business, but Curtiss was unable to provide much information about these ads.  We conclude that this digit, based on trade show advertising, is minimally probative.

The sixth digit of confusion further supports a likelihood of confusion.  Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse may alone be sufficient to justify an inference that there is a likelihood of confusion.[57]  As noted by the district court, Smack admitted that it "'used school colors and 'other indicia' with the intent of identifying the university plaintiffs as the subject of the message expressed in the shirt design.'"[58]  Curtiss testified that it was "no coincidence" that Smack's shirts incorporated the color schemes of the plaintiff Universities and that he designed the shirts to make people think of the particular school that each shirt targeted.  Smack asserts that its intent to copy is not the same as an intent to confuse.  The circumstances of this case show, however, that Smack intended to capitalize

---

[56] Id.

[57] Elvis Presley Enters., 141 F.3d at 203.

[58] Bd. of Supervisors, 438 F. Supp. 2d at 661 (citation omitted).

20

on the potential for confusion. Smack knew that its shirts were sold in the same venues as and sometimes alongside officially licensed merchandise, and it intentionally incorporated color marks to create the kind of association with the Universities that would influence purchasers.

The Eleventh Circuit found a likelihood of confusion based on a similar intent by the defendant to capitalize on the popularity of a college sports team. Univ. of Ga. Athletic Ass'n v. Laite.[59] In Laite, the defendant used school colors and a mark strikingly similar to the University of Georgia's bulldog mascot on cans to sell "Battlin' Bulldog Beer."[60] After concluding that the defendant's bulldog mark was similar to the university's mark, the court turned to the defendant's intent, concluding "there can be no doubt that Laite hoped to sell 'Battlin' Bulldog Beer' not because the beer tastes great, but because the cans would catch the attention of University of Georgia football fans."[61] Significantly, the court found "the defendant's intent and the similarity of design between the two marks sufficient to support the district court's finding of a 'likelihood of confusion . . . .'"[62] The same is true here. Smack did not hope to sell its t-shirts because of some competitive difference in quality or design compared with the Universities' licensed products, but rather it intended to take advantage of the popularity of the Universities' football programs and the appearance of the school teams in the college bowl games. We have previously said that when a "mark was adopted with the intent of deriving benefit from the reputation of [the mark holder] that fact alone 'may be sufficient to justify the inference that there

---

[59] 756 F.2d 1535 (11th Cir. 1985).

[60] Id. at 1537.

[61] Id. at 1545 (footnote omitted).

[62] Id. at 1545.

is confusing similarity.'" Amstar Corp. v. Domino's Pizza, Inc.[63] We believe that Smack's admitted intent and the similarity in appearance between Smack's shirts and the Universities' licensed products is strong evidence of a likelihood of confusion.

Smack argues that an intent to confuse is negated by its use of its own logo and the words "Talkin' the Talk," which it maintains identifies it as the source of the shirt. We are not persuaded. Smack's logo appears in a space that is only 2.5 inches wide. We cannot conclude, without more, that this small and inconspicuous placement of the logo would disabuse consumers of a mistaken belief that the Universities sponsored, endorsed or were otherwise affiliated with the t-shirts.[64] Smack has not pointed to evidence that its own logo is recognizable by consumers or that it was acting to trade off its own reputation as a producer of specialty t-shirts.[65] Nor are we convinced that Smack's logo on the shirts acts as a disclaimer. The Universities point out that they require all licensed products to contain the licensee's name. Therefore, a consumer could believe that Smack's logo merely indicated that it was a licensee.[66] We conclude

---

[63] 615 F.2d 252, 263 (5th Cir. 1980) (quoting RESTATEMENT OF TORTS § 729, comment f (1938)).

[64] See Pebble Beach, 155 F.3d at 552 (noting that "conspicuous disclaimers that disclaim affiliation may reduce or eliminate confusion").

[65] See, e.g., Univ. of Kan. v. Sinks, 565 F. Supp. 2d 1216, 1244–45, 1247–48 (D. Kan. Mar. 19, 2008) (finding a likelihood of confusion with respect to defendant's manufacture of t-shirts that were substantially similar to officially licensed goods, but not shirts that it found contained substantial differences, in part because "[t]he high degree of similarity weighs strongly in favor of a finding of intent; the use of almost identical marks supports a conclusion that defendants intended to derive a benefit from KU's reputation, rather than rely upon their own").

[66] See A.T. Cross Co. v. Jonathan Bradley Pens, Inc., 470 F.2d 689, 692 (2d Cir. 1972) (defendant's placement of its own name on pen also bearing mark similar to plaintiff's mark "does not save the day; a purchaser could well think plaintiff had licensed defendant as a second user and the addition is thus 'an aggravation, and not a justification'" (citation omitted)).

that the intent digit weighs in favor of a conclusion that there is a likelihood of confusion.

The seventh digit is evidence of actual confusion. Evidence that consumers have been actually confused in identifying the defendant's use of a mark as that of the plaintiff may be the best evidence of a likelihood of confusion.[67] It is well established, however, that evidence of actual confusion is not necessary for a finding of a likelihood of confusion.[68] The district court did not resolve whether there was sufficient evidence of actual confusion, and because such evidence is not required we also find it unnecessary to pass on the question further.[69]

With respect to the eighth digit of confusion–the degree of care exercised by potential purchasers–the district court held that the t-shirts at issue are relatively inexpensive impulse items that are not purchased with a high degree of care.[70] Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion.[71] Smack contends there was insufficient evidence for the district court's conclusion. In response, the Universities note Curtiss' testimony that he hoped customers' decisions to purchase Smack's shirts would be "quick," and they point out that the shirts sell for less than $18. Smack cites no evidence to demonstrate an issue of fact on

---

[67] Elvis Presley Enters., 141 F.3d at 203.

[68] Id.; Pebble Beach, 155 F.3d at 545; Amstar, 615 F.2d at 263.

[69] The Universities contend that there was evidence of actual confusion consisting of consumer surveys concerning two of the six t-shirt designs and testimony from Curtiss that "I have had people come up and go–at the booth and go, 'Are these licensed?'" The evidence is arguably minimal, see Amstar, 615 F.2d at 263, but as discussed we need not resolve the matter.

[70] Bd. of Supervisors, 438 F. Supp. 2d at 661.

[71] Sun-Fun-Prods., Inc. v. Suntan Research & Dev. Inc., 656 F.2d 186, 191 (5th Cir. 1981).

this point, and we agree with the district court that this digit weighs in favor of a likelihood of confusion.

After reviewing the record, we conclude that there is no genuine issue of fact that Smack's use of the Universities' color schemes and other identifying indicia creates a likelihood of confusion as to the source, affiliation, or sponsorship of the t-shirts. As noted above, the digits of confusion—particularly the overwhelming similarity of the marks and the defendant's intent to profit from the Universities' reputation—compel this conclusion. This is so, we have noted, because Smack's use of the Universities' colors and indicia is designed to create the illusion of affiliation with the Universities and essentially obtain a "free ride" by profiting from confusion among the fans of the Universities' football teams who desire to show support for and affiliation with those teams.[72] This creation of a link in the consumer's mind between the t-shirts and the Universities and the intent to directly profit therefrom results in "an unmistakable aura of deception" and likelihood of confusion.[73]

Smack contends that there is no evidence that consumers care one way or the other whether t-shirts purchased for wear at a football game are officially licensed and that, absent evidence that consumers prefer licensed merchandise, it was error for the district court to conclude there was a likelihood of confusion. Smack relies in part on our decision in Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Company.[74] The context of that case is different from the instant case.

---

[72] See Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 33 (1st Cir. 1989) ("Defendants' shirts are clearly designed to take advantage of the Boston Marathon and to benefit from the good will associated with its promotion by plaintiffs. Defendants thus obtain a 'free ride' at plaintiffs' expense.").

[73] Id. at 35.

[74] 676 F.2d 1079 (5th Cir. 1982).

24

In Rainbow for Girls, a fraternal organization and its official jeweler sued a retailer for trademark infringement based on the retailer's sale of jewelry bearing the organization's registered mark. Purchasers in the fraternal-organization jewelry market bought jewelry to show membership and status in the organization.[75] We upheld the district court's finding of no likelihood of confusion, concluding that "[t]he fact that purchasers purchased Rainbow jewelry as a direct result of the presence of the Rainbow emblem does not compel the conclusion that they did so believing that the jewelry was in any way endorsed, sponsored, approved or otherwise associated with Rainbow, given the court's findings."[76] The district court had held that there was no historic custom or practice specific to Rainbow jewelry or to the fraternal jewelry industry that Rainbow jewelry could be manufactured only with Rainbow's sponsorship or approval.[77] Instead, the court noted that fraternal organizations exercised little control over the manufacture of jewelry bearing their emblems.[78] Furthermore, the court had held that because Rainbow's "official jeweler" was itself well-advertised and used its own distinctive mark on the jewelry, any jewelry without that distinctive mark could not cause confusion.[79] We noted that the district court's findings distinguished the case from our decision in Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing.[80]

---

[75] Id. at 1084.

[76] Id. (emphasis added).

[77] Id. at 1083.

[78] Id.

[79] Id.

[80] Id.

In Boston Hockey, we held that the defendant infringed the plaintiff's trademark rights by selling embroidered patches containing the emblems of professional hockey teams.[81] There, the emblems were sold for use by the public to show "allegiance to or identification with the teams."[82] We held that the likelihood of confusion requirement was met because the defendant duplicated and sold the emblems "knowing that the public would identify them as being the teams' trademarks" and because the public's "certain knowledge . . . that the source and origin of the trademark symbols were in plaintiffs satisfies the requirements of the act."[83]

Subsequently, in Kentucky Fried Chicken Corporation v. Diversified Packaging Corporation, we recognized that Boston Hockey might be read to dispose of the confusion issue when buyers undoubtedly know that the plaintiff is the source and origin of a mark.[84] We reiterated that a showing of likelihood of confusion was still required.[85] But we noted that the circumstances in Boston Hockey supported the likelihood of confusion there insofar as the sale of products "universally associated" with the hockey team "supported the inescapable inference that many would believe that the product itself originated with or was somehow endorsed by Boston Hockey."[86] In Rainbow for Girls, the district court opinion, which we upheld, also recognized in reference to Boston Hockey that "'(i)t is not unreasonable to conclude, given the degree to which sports

---

[81] 510 F.2d 1004 (5th Cir. 1975).

[82] Id. at 1011.

[83] Id. at 1012.

[84] 549 F.2d 368, 389 (5th Cir. 1977).

[85] Id.

[86] Id.

emblems are used to advertise teams and endorse products, that a consumer seeing the emblem or name of a team on or associated with a good or service would assume some sort of sponsorship or association between the product's seller and the team.'"[87]

We agree with this reasoning as applied to this case, which is more like Boston Hockey than Rainbow for Girls. We hold that given the record in this case and the digits of confusion analysis discussed above—including the overwhelming similarity between the defendant's t-shirts and the Universities' licensed products, and the defendant's admitted intent to create an association with the plaintiffs and to influence consumers in calling the plaintiffs to mind—that the inescapable conclusion is that many consumers would likely be confused and believe that Smack's t-shirts were sponsored or endorsed by the Universities. The Universities exercise stringent control over the use of their marks on apparel through their licensing program. It is also undisputed that the Universities annually sell millions of dollars worth of licensed apparel. We further recognize the public's indisputable desire to associate with college sports teams by wearing team-related apparel. We are not persuaded that simply because some consumers might not care whether Smack's shirts are officially licensed the likelihood of confusion is negated. Whether or not a consumer cares about official sponsorship is a different question from whether that consumer would likely believe the product is officially sponsored. For the foregoing reasons, we conclude that a likelihood of confusion connecting the presence of the Universities' marks and the Universities' themselves was demonstrated in this case.

C. Functionality

---

[87] Rainbow for Girls, 676 F.2d at 1085.

A product feature that is functional does not qualify for protection under the Lanham Act.[88] The party seeking protection under the Lanham Act has the burden of establishing nonfunctionality. *TrafFix Devices, Inc. v. Marketing Displays, Inc.*[89] The Supreme Court has recognized two tests for determining functionality. "[T]he primary test for determining whether a product feature is functional is whether the feature is essential to the use or purpose of the product or whether it affects the cost or quality of the product."[90] This is the "traditional" test.[91] "Under this traditional definition, if a product feature is 'the reason the device works,' then the feature is functional."[92] Under a secondary test for functionality "a functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage."[93] This is the "competitive necessity" test.[94]

In Boston Hockey, we held that emblems of a hockey team sold on embroidered patches had no demonstrated value other than their significance as the trademarks of the team.[95] Relying on our decision in Boston Hockey, the district court here similarly held that the Universities' color schemes, logos, and designs also had no significance other than to identify with the Universities and

---

[88] Qualitex, 514 U.S. at 164–65, 115 S. Ct. at 1304; Eppendorf, 289 F.3d at 355.

[89] 532 U.S. 23, 32, 121 S. Ct. 1255, 1261 (2001).

[90] Eppendorf, 289 F.3d at 356 (citing TrafFix, 532 U.S. at 32–33, 121 S. Ct. 1261–62).

[91] Id. at 355.

[92] Id.

[93] Id. at 356 (internal quotation and citation omitted).

[94] Id.

[95] Boston Prof'l Hockey, 510 F.2d at 1013.

were therefore nonfunctional.[96]  We agree.  Fans and other members of the public purchase Smack's shirts only because the shirts contain the plaintiffs' colors and indicia identifying the Universities' football teams, just as people purchased the defendant's emblems in Boston Hockey only because they contained the hockey team's trademarks.[97]  In other words, the presence of the plaintiffs' marks serve no function unrelated to trademark.

Smack argues that the Universities' colors do perform functions unrelated to trademark because the Universities use the colors in activities and programs in connection with student life, buildings, and other programs and events and that the colors are not used solely to identify the Universities as a source of goods.  However, the claimed trademarks are in the color schemes and other indicia of the Universities when combined on merchandise that refer to the Universities.  It is proper, therefore, to examine that context when determining the functionality of the claimed marks.[98]  As explained above, the Universities' colors and indicia when used on merchandise creates secondary meaning tending to identify the Universities in the minds of consumers as the producers, sponsors, or endorsers of the product.

The school colors and other indicia used here do not make the t-shirts "work."  The t-shirts would function just as well as articles of clothing without the colors and designs. Smack's t-shirts are sold not because of any functionality in the marks Smack placed on them but rather because they bear the

---

[96] Bd. of Supervisors, 438 F. Supp. 2d at 661–62.

[97] See Boston Prof'l Hockey, 510 F.2d at 1013.

[98] Cf. Elvis Presley Enters., 141 F.3d at 197 ("Courts consider marks in the context that a customer perceives them in the marketplace . . . .").

identifiable marks of the plaintiff Universities.[99] The marks fail under the traditional test for functionality and are protectible.

Smack urges, however, that the Universities' colors on the t-shirts serve several functional purposes. It contends that the shirts allow groups of people to bond and show support for a philosophy or goal; facilitate the expression of loyalty to the school and a determination of the loyalties of others; and identify the wearer as a fan and indicate the team the fan is supporting. These claimed functional uses are nothing more than the kind of aesthetic uses at issue in Boston Hockey. Our circuit has consistently rejected the concept of aesthetic functionality.[100]

Smack asserts that the Supreme Court has recognized aesthetic functionality, and it relies on the interplay between the Court's decisions in Qualitex and TrafFix. As noted above, the Court recognized in Qualitex that color alone could be protected as a trademark.[101] In its discussion of functionality, the Court noted that the purpose of the functionality doctrine is to prevent use of a product's feature as a trademark where doing so would hinder competition, and it set forth the traditional definition where functionality turns on whether the feature is "'essential to the use or purpose of the article' or 'affects [its] cost or quality.'"[102] After discussing aesthetic functionality in the Restatement (Third) of Unfair Competition, the Court went on to state that "where a color serves a significant nontrademark function . . . courts will examine whether its use as a mark would permit one competitor (or a group) to

---

[99] See Boston Hockey, 510 F.2d at 1013.

[100] See id.; Sno-Wizard, 791 F.2d at 426 n.3; Pebble Beach, 155 F.3d at 540 n.6.

[101] Qualitex, 514 U.S. at 163–64, 115 S. Ct. at 1303–04.

[102] Id. at 169, 115 S.Ct. at 1306 (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 850 n.10, 102 S. Ct. 2182, 2186 n.10 (1982)).

interfere with legitimate (nontrademark-related) competition through actual or potential exclusive use of an important product ingredient. That examination should not discourage firms from creating esthetically pleasing mark designs, for it is open to their competitors to do the same."[103]

In TrafFix, the Court reiterated the traditional test for functionality and expanded on the secondary "competitive necessity" test.[104] The Court explained that if a product feature is found to be functional under the traditional test, which it was in that case, the inquiry ends and there is no need to consider whether the feature is a competitive necessity.[105] The Court went on to state, however, that it is proper to inquire into the competitive necessity test in cases of aesthetic functionality, which the Court stated "was the central question" in Qualitex.[106]

Smack relies on this pronouncement in TrafFix for the proposition that the Supreme Court has recognized the aesthetic functionality doctrine. We note that the TrafFix Court's characterization of the issue in Qualitex has been harshly criticized by commentators.[107] Nevertheless, neither Qualitex nor TrafFix addressed aesthetic functionality as the dispositive issue, let alone the purported aesthetic functionality of a color-scheme that acts to identify and create a desired

---

[103] Id. at 170, 115 S. Ct. at 1306.

[104] TrafFix, 532 U.S. at 32, 121 S. Ct. at 1261.

[105] Id. at 33, 121 S. Ct. at 1262. The product feature at issue in TrafFix was a dual-spring mechanism designed to keep outdoor signs upright in the wind.

[106] Id.

[107] See 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:80 (4th ed.) (calling "amazing and incomprehensible [the] statement that in the 1995 Qualitex case, 'aesthetic functionality was the central question'").

association with the particular source.[108]  We do not believe that the Court's dictum in TrafFix requires us to abandon our long-settled view rejecting recognition of aesthetic functionality.[109]

Furthermore, we believe application of the competitive necessity test does not require a different result.  Smack contends that it will be placed at a significant non-reputation-related disadvantage if it "is unable to satisfy consumer demand for game day clothing that allows fans to conform to the crowd, or satisfy consumer demand for game day clothing that matches other items of clothing worn by the consumer."  Smack has admitted that the colors and indicia on its shirts are designed to call the Universities to the mind of the fans, and it acknowledges in its brief that fans purchase t-shirts to wear to football games to show the colors of the team that the consumer is supporting. In other words, fans desire to wear the t-shirts precisely because they show the Universities' marks.   The Court in Qualitex stressed that the focus of functionality is "legitimate (non-trademark-related) competition."[110]  But here any demand for Smack's t-shirts is inextricably tied to the Universities' trademarks themselves.[111]  We agree with the Ninth Circuit that "the fact that a trademark is desirable does not, and should not, render it unprotectable."[112]

---

[108] See id. (stating that "the Supreme Court has never directly addressed aesthetic functionality as a dispositive issue in a case"); see also Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc., 457 F.3d 1062, 1070  (9th Cir. 2006) ("The Supreme Court has yet to address aesthetic functionality as it applies to logos and insignia in contrast to product features.").

[109] See N.L.R.B. v. Datapoint Corp., 642 F.2d 123, 129 (5th Cir. 1981) ("Without a clearly contrary opinion of the Supreme Court or of this court sitting en banc, we cannot overrule a decision of a prior panel of this court . . . ." (emphasis added)).

[110] Qualitex, 514 U.S. at 170, 115 S. Ct. at 1306.

[111] Au-Tomotive Gold, 457 F.3d at 1074.

[112]  Id. at 1072.

Smack's alleged competitive disadvantage in the ability to sell game day apparel relates solely to an inability to take advantage of the Universities' reputation and the public's desired association with the Universities that its shirts create. This is not an advantage to which it is entitled under the rubric of legitimate competition.[113] We conclude that the district court correctly held that the marks at issue here are nonfunctional.

### D. Nominative fair use

Smack argues that it incorporated the Universities' colors in its t-shirts to identify the Universities as the subject of the shirts. It contends that this was a protected nominative fair use.

The nominative fair use doctrine provides that "one who has lawfully copied another's product can tell the public what he has copied."[114] It also permits one to "use another's mark truthfully to identify another's goods or services in order to describe or compare its product to the markholder's product."[115] The right of fair use is limited, however, insofar as "the use cannot be one that creates a likelihood of confusion as to source, sponsorship, affiliation, or approval."[116]

We have held that a nominative fair use claim is a claim that a mark's use is noninfringing and therefore creates no likelihood of confusion.[117] Thus, we have also said that a court ordinarily should consider a nominative fair use claim

---

[113] See Pebble Beach, 155 F.3d at 539 ("To define functionality based upon commercial success would allow the second comer to trade on the first comer's goodwill, purely because it would be easier to market his product and not because he could not produce a viable, competitive product.").

[114] Id. at 545.

[115] Id. at 546.

[116] Id.

[117] Id. at 545.

in conjunction with its likelihood-of-confusion analysis in order to avoid lowering the standard for confusion.[118] Smack argues that the district court here first determined that there was a likelihood of confusion and then determined that there could be no nominative fair use because of that likelihood, thereby lowing the confusion standard. We are not convinced of any error. Although the alleged nominative fair use should usually be considered along with the likelihood-of-confusion analysis, we have declined to require any particular method for the consideration in cases where the nominative use is not a significant factor in the liability determination.[119] We think this is such a case.

In order to avail oneself of the nominative fair use defense "the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) may not do anything that suggests affiliation, sponsorship, or endorsement by the markholder."[120] Smack used the Universities' colors and indicia in more than a nominative sense. It did not incorporate the colors and other indicia to describe or compare its shirts with shirts licensed by the Universities, nor did it do so to tell the public what it had copied. Smack did incorporate the marks to identify the Universities as the subject of the shirts, but it did so in a way that improperly suggested affiliation, sponsorship, or endorsement.

To take a simple example, two shirt designs targeted toward the fans of OSU and USC refer to the number of national championships those universities have won and ask, respectively, "got seven?" and "got eight?" Both shirts proclaim "WE DO!" and contain other specific indicia identifying the schools. Smack did not win any national championships—the respective Universities did.

---

[118] Id. at 547.

[119] Id. at 547 n.14.

[120] Id. at 546.

The use of the inclusive first-person personal pronoun "we" easily permits the inference that the schools are the speakers in the shirts and therefore endorsed the message.

As noted by the district court, Smack copied the mark with "an intent to rely upon the drawing power in enticing fans of the particular universities to purchase their shirts."[121] Such an attempt to capitalize on consumer confusion is not a nominative fair use.[122] We conclude that the district court correctly granted summary judgment to the Universities on this issue.

## E. Laches

Smack asserts that it is undisputed the LSU Athletic Department purchased several of its purple and gold t-shirt designs, none of which are at issue in this case, for sale in the LSU stadium gift shop between 2001 and 2004. It argues that because LSU never objected to the shirt designs even though they were similar to the designs involved in this case, the doctrine of laches is applicable.

Laches is "an inexcusable delay that results in prejudice to the defendant."[123] "Laches comprises three elements: (1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay."[124] A defendant who intentionally infringes a trademark with the bad faith intent to capitalize on the markholder's

---

[121] Bd. of Supervisors, 438 F. Supp. 2d at 661 (internal quotation marks omitted).

[122] See New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 308 (9th Cir. 1992).

[123] Elvis Presley Enters., 141 F.3d at 205 (internal quotation marks omitted).

[124] Westchester Media, 214 F.3d at 668.

good will lacks the clean hands necessary to assert the equitable defense. Conan Props., Inc. v. Conans Pizza, Inc.[125]

The district court held that because Smack admitted it intentionally copied the plaintiffs' color schemes, Smack's bad faith precluded the assertion of laches.[126] In Conan Properties, we held that although a defendant's intentional use of a plaintiff's mark may give rise to "a presumption that the defendant intended to cause public confusion as to the source or sponsorship of the product," such an intentional use "does not give rise to a presumption that the defendant intended to appropriate the plaintiff's good will."[127] Unlike Conan Properties, the record here establishes the substantive and knowing bad faith necessary to foreclose an equitable defense.[128] Smack did not simply admit that it knew the plaintiff Universities used marks similar to its own. Rather, it admitted that it intentionally incorporated the Universities' color schemes and other indicia in order to specifically call the Universities to the public's mind, thus deriving a benefit from the Universities' reputation.[129] The district court properly declined to apply the defense of laches.[130]

---

[125] 752 F.2d 145, 150–51 & n.2 (5th Cir. 1985).

[126] Bd. of Supervisors, 438 F. Supp. 2d at 663.

[127] See Conan Props., 752 F.2d at 151 n.2.

[128] See id.

[129] See id.; Armco, Inc. v. Armco Burglar Alarm Co., 693 F.2d 1155, 1159 n.7 (5th Cir. 1982).

[130] The district court separately held that (1) OU was entitled to summary judgment on its claim that Smack's shirts highlighting "OU" infringed OU's unregistered mark in those initials, and (2) LSU was entitled to summary judgment on its LUTPA claim. Bd. of Supervisors, 438 F. Supp. 2d at 663. The court reasoned that its digits-of-confusion analysis applied with equal force to OU's claim and that the requirements for a claim under LUTPA mirror those of the Lanham Act. Id. We agree with the district court. See also Louisiana World Exposition, Inc. v. Logue, 746 F.2d 1033, 1039 (5th Cir. 1984) (holding that likelihood of confusion is the essential ingredient for claims under both LUTPA and the Lanham Act).

F. Actual damages

Smack argues that the district court erroneously denied its motion for judgment as a matter of law at the trial on damages. It asserts that the plaintiffs were not entitled to recover actual damages without evidence of actual confusion. It is settled in this circuit, however, that actual confusion is not a necessary prerequisite to an award of money damages.[131]

G. Attorneys' fees

The Universities separately appeal the district court's denial of their request for an award of attorneys' fees. The district court may award a prevailing party its reasonable attorneys' fees under the Lanham Act "in exceptional cases."[132] We review the district court's determination as to whether a case is exceptional for clear error, and we review the district court's decision whether to award attorneys' fees for an abuse of discretion. Scott Fetzer Co. v. House of Vacuums, Inc.[133]

The prevailing party bears the burden of demonstrating the exceptional nature of the case by clear and convincing evidence.[134] "An exceptional case is one where the violative acts can be characterized as malicious, fraudulent,

---

[131] Taco Cabana, 932 F.2d at 1126. Although Smack asserts that the Universities presented no evidence from which the jury could find actual confusion, its argument addresses the plaintiffs' entitlement to damages and does not contest the jury's specific award of damages. We therefore do not consider whether the damages themselves were supported by sufficient evidence.

[132] 15 U.S.C. § 1117(a).

[133] 381 F.3d 477, 490 (5th Cir. 2004).

[134] Id.

37

deliberate, or willful."[135] The necessary showing demands a "high degree of culpability on the part of the infringer, for example bad faith or fraud."[136]

Smack intentionally copied the Universities' color schemes for use on its shirts and admitted doing so. Yet, we have held that deliberate copying does not render a case per se exceptional.[137] When assessing whether a case is exceptional, courts must consider all the facts and circumstances.[138] We are further mindful that the district court, having heard the evidence, observed the witnesses, and appraised the parties' motives, is in the best position to make this determination.[139] The district court determined at the summary judgment stage that Smack acted in bad faith and was precluded from asserting the equitable defense of laches. However, an actor's bad faith in violating the Lanham Act does not per se equate to malicious, fraudulent, or willful conduct justifying an award of attorneys' fees.[140] The district court here credited Curtiss' testimony that he believed based on a settlement agreement in another case that he could use school colors and design elements in his shirts as long as he did not use the school's name or initials.[141] As the district court also recognized, this case

---

[135] Pebble Beach, 155 F.3d at 555 (internal quotation marks and citation omitted).

[136] Id. at 556.

[137] Id.

[138] Id. at 555.

[139] Taco Cabana, 932 F.2d at 1127.

[140] See People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 370 (4th Cir. 2001) (holding that defendant's bad faith in violating the anti-cybersquating statute did not compel a finding of malicious, fraudulent, willful or deliberate behavior for attorneys' fees under the Lanham Act).

[141] See Pebble Beach, 155 F.3d at 556 ("'[a] district court normally should not find a case exceptional where the party presents what it in good faith believes may be a legitimate defense'" (citation omitted)).

presents somewhat novel issues—also evident by the presence of several amicus briefs—concerning the trademark protection for color schemes used by the Universities. A party does not act in bad faith by predicating his legal claim or defense on an unsettled legal theory.[142]

We have carefully considered the Universities' arguments but conclude that the district court neither clearly erred nor abused its discretion. We therefore affirm the denial of attorneys' fees.

AFFIRMED.

---

[142] See Scott Fetzer Co., 381 F.2d at 490.