Thomas Kenneth **ABRAHAM**, an individual d/b/a Paddle Tramps Mfg. Co., Plaintiff,

v.

**ALPHA CHI OMEGA**, an unincorporated association, et al., Defendants.

Case No. 3:08–cv–570–F.

United States District Court, N.D. Texas, Dallas Division.

July 6, 2011.

Elizann Carroll, Molly B. Richard, Richard Law Group Inc., Dallas, TX, Jeffrey S.

Levinger, Hankinson Levinger LLP, Dallas, TX, for Plaintiff.

D. Ronald Reneker, Munsch Hardt Kopf & Harr P.C., Jason A. Wietjes, Bracewell & Giuliani LLP, Dallas, TX, Amy S. Cahill, Haley M. Dickerson, Jack A. Wheat, Jennifer L. Kovalcik, Stites & Harbison PLLC, Louisville, KY, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ROYAL FURGESON, Senior District Judge.

BEFORE THE COURT is a Motion for Summary Judgment filed by Plaintiff Paddle Tramps Manufacturing Company ("Paddle Tramps") (Docket No. 48). Defendants in this case, an assortment of fraternity and sorority organizations ("the Greek Organizations"),[1] filed a Response (Docket No. 63), and Paddle Tramps filed a subsequent Reply (Docket No. 70). In a previous Order (Docket No. 75), the Court granted the Greek Organizations' Motion for Summary Judgment as to their claims, determining that Paddle Tramps had committed trademark infringement and unfair competition under federal law and trademark dilution under Texas state law. The instant Motion concerns Paddle Tramps's contention that the Greek Organizations' claims of trademark infringement, unfair competition, and trademark dilution are barred by the defenses of laches and acquiescence. The Court held a hearing to address this Motion on May 26, 2011. After hearing oral arguments, the Court asked the parties to provide supplemental

1. The Greek Organizations include Alpha Chi Omega, Alpha Delta Pi, Alpha Gamma Delta, Alpha Gamma Rho, Alpha Omicron Pi, Alpha Phi, Alpha Tau Omega, Alpha Xi Delta, Beta Theta Pi, Chi Omega, Chi Phi, Delta Chi, Delta Delta Delta, Delta Gamma, Delta Phi Epsilon, Delta Tau Delta, Gamma Phi Beta, Kappa Alpha, Kappa Delta, Kappa Sigma, Lambda Chi Alpha, Phi Delta Theta, Phi Kappa Sigma, Phi Kappa Tau, Phi Kappa Theta, Pi Kappa Alpha, Pi Beta Phi, Sigma Alpha Epsilon, Sigma Chi, Sigma Kappa, Sigma Phi Epsilon, and Tau Kappa Epsilon, along with their corporate affiliates.

briefing on the issue of how a finding of laches and acquiescence would impact the potential relief available in this case. These supplemental briefs were filed on June 9, 2011 (Docket Nos. 78 & 79). After considering the arguments of both parties, the Court is of the opinion that Paddle Tramps's Motion for Summary Judgment should be DENIED.[2]

## I. Factual and Procedural History

For the purpose of this Motion for Summary Judgment, the Court shall view the facts in the light most favorable to the non-moving party. *General Univ. Sys., Inc. v. Lee,* 379 F.3d 131, 137 (5th Cir. 2004); *Texas Tech Univ. v. Spiegelberg,* 461 F.Supp.2d 510, 528 (N.D.Tex.2006) (Cummings, J.). The Court discussed the facts of this case related to infringement and dilution in its previous Order Granting in Part and Denying Without Prejudice in Part the Greek Organizations' Motion for Summary Judgment (Docket No. 75). Here, the Court shall discuss facts primarily relevant to the merits of Paddle Tramps's defenses of laches and acquiescence, and the parties' arguments regarding the applicability of those defenses.

### A. The Parties

The 32 defendants and counter-plaintiffs in this case are all Greek fraternity and sorority organizations with chapters on college campuses throughout the nation. All of the Greek Organizations were founded no later than 1959, and most of them are over 100 years old. The Greek Organizations act as holding-type companies which hold ownership of their properties, including their trademarks. Those trademarks, which include Greek letter combinations, symbols, and crests, are often used on ceremonial decorative paddles and other merchandise sold to members of the Greek Organizations through various vendors.

Paddle Tramps was founded by Thomas Kenneth Abraham ("Kenneth Abraham"), who had been a pledge in the Phi Gamma Delta fraternity in 1960 in Lubbock, Texas in 1961.[3] Kenneth Abraham testified that he founded the business after seeing the difficulties for pledges who were undergoing the process of constructing a ceremonial paddle. Paddle Tramps's purpose was to provide materials to members of Greek Organizations for them to construct traditional decorative paddles. Generally, Paddle Tramps would provide fraternity and sorority members with blank paddles and various wooden figures to decorate them, and the members would glue the figures to the paddle itself. The wooden figures sold by Paddle Tramps included individual Greek letters, which, while not associated with any Greek Organization when considered individually, could be combined to form the Greek letter insignia of a fraternity or sorority. Paddle Tramps also sold wooden replicas of the Greek Organizations' crests and symbols that could be glued to a ceremonial paddle. Paddle Tramps largely markets its products through wholesaling and sales at individual retailers, as well as at its own shop in Lubbock, Texas. Paddle Tramps also distributed catalogs for individual orders to potential customers. According to Paddle Tramps, the services provided by Kenneth Abraham and Paddle Tramps were either not available or scarcely available at the time of its founding.

In 1997, Paddle Tramps founded a website (*www.paddletramps.com*). At first, the website merely provided information about Paddle Tramps's products. In 2001, however, Paddle Tramps began accepting orders from customers through its website.

---

**2.** This resolves Docket No. 48.

**3.** Phi Gamma Delta is not a party to this action.

As part of its sales efforts, Paddle Tramps would offer "paddle kits" for sale. The "paddle kits" would contain a blank paddle and all of the letters, symbols, and other figures necessary for a member of a Greek Organization to decorate the paddle. The "paddle kits" were identified on the website with individual Greek Organizations; for example, a member of Delta Delta Delta could go on Paddle Tramps's website and select and order a "Delta Delta Delta Paddle Kit," which would contain all of the materials necessary for the member to construct her paddle, without ordering all of the individual pieces. The Greek Organizations have also alleged that Paddle Tramps has purchased keyword advertising code from Internet search engines and service providers and has embedded the keyword of the Greek Organizations in its website, so that a search for that Greek Organization and the materials necessary to construct a paddle would appear at the top of any Internet search.

## B. Paddle Tramps's Initial Contacts with the Greek Organizations

Following Paddle Tramps's founding, Kenneth Abraham visited various Texas Tech fraternity and sorority houses showcasing his products, and took orders from Paddle Tramps's store location in Lubbock, Texas. By 1964, Paddle Tramps had arranged for products to be manufactured and shipped to customers from its Lubbock location. As the 1960s progressed, Paddle Tramps's business expanded outside of the state of Texas. Paddle Tramps utilized its own catalogs and traveling salesmen to contact fraternity and sorority chapters at various schools to advertise their products. Eventually, Paddle Tramps began wholesaling its products to stores and retail outlets. Kenneth Abraham's testimony indicates that he was selling products for all of the Greek Organizations who are parties to this lawsuit by 1966, and corresponded with members of a

number of the organizations. In its catalog published in 1966, Paddle Tramps specifically advertised individual products for a number of the Greek Organizations. Certain Greek Organizations, such as Delta Delta Delta, distributed Paddle Tramps's catalog as early as 1968. Delta Shop, an affiliate of Delta Delta Delta, specifically worked with Paddle Tramps to distribute products for its national conventions in the late 1960s. Other organizations apparently became aware of Paddle Tramps's business throughout the 1970s and 1980s. As the business grew, Paddle Tramps began wholesaling its products to third-party stores throughout the country and participating in various trade shows.

At no point during this early period of its existence did Paddle Tramps attempt to enter into a licensing agreement with any of the Greek Organizations. Conversely, the Greek Organizations did not reach out to Paddle Tramps about obtaining a license to sell products bearing the Greek Organizations' names, insignia, or crests during this time. Paddle Tramps raises a number of indications that the Greek Organizations, either individually or collectively, were aware of or should have been aware of Paddle Tramps's unlicensed use of their marks, either through the distribution of catalogs, sales to their members, presence at trade shows, or other interactions. However, at no point did the Greek Organizations attempt to stop Paddle Tramps from continuing its business throughout the first several decades of its existence.

## C. The Greek Organizations' Licensing Programs

Despite the long histories of most of the Greek Organizations, most of them have only begun to enforce their marks with vigor within the past two decades. Through their charters, guides, and infor-

mational materials, the Greek Organizations indicate that commercial uses of their marks and insignia are limited. The Greek Organizations have undertaken licensing efforts in various ways since their creation. However, as the Greek Organizations admit, they have begun strongly pursuing vendors to become licensed and enforcing their trademarks in the past several decades, at least partly due to unlicensed vendors producing products that were tasteless or offensive. As part of this enhanced effort, each of the Greek Organizations currently have licensing programs, and license hundreds of vendors to produce memorabilia containing the Greek letter combinations, insignia, crests, and symbols. The Greek Organizations have hired Affinity Marketing Consultants ("AMC") to manage their licensing programs, which include over 10,000 licensing agreements with numerous authorized vendors to sell merchandise containing their Greek letter combinations, insignia, crests, and symbols. Most vendors of such merchandise are licensed, as Kyle Abraham, the son of Paddle Tramps's founder and an officer of Paddle Tramps, admitted in his deposition. Defs.' App., Docket No. 55, at 51, Kyle Abraham Dep. at 53. Products licensed by the Greek Organizations are identified by a stylized symbol, which consists of a circle bordered by the characters of the Greek Alphabet and containing the words "Greek Licensed Product" in the center. *See* Defs.' App., Docket No. 55, at 309–10.

As part of their efforts to educate their members about licensing, the Greek Organizations have sent notices to members urging them to only purchase products bearing their Greek letter combinations, insignia, crests, and symbols from licensed vendors. This effort involves posting such information on the Greek Organizations' websites, publishing the information in fraternity and sorority newsletters, presenting the information at leadership conferences and in new member educational

sessions, and through emails, letters, and flyers distributed to their members.

### D. Later Objections to Use of Marks by Greek Organizations

In the 1990s, many of the Greek Organizations contacted Paddle Tramps via letters informing Paddle Tramps of their awareness of unlicensed use of the Greek Organizations' names and insignia and inviting Paddle Tramps to become licensed. Some of these efforts were undertaken by individual or groups of Greek Organizations; however, a number of them were done at their behest by AMC, which manages their licensing programs. Letters were sent requesting Paddle Tramps to become licensed by various Greek Organizations in 1990, 1991, 1993, 1994, 1996, 1998, 2002, 2003, and 2004. Based upon these letters, Paddle Tramps asserts that 28 of the 32 Greek Organizations had actual knowledge of Plaintiff's use of their trademarks at least four years prior to counterclaims being filed in this case. The four remaining Greek Organizations notified Paddle Tramps of their objections to the use of their marks and the need to become licensed in 2006, but Paddle Tramps alleges that they had constructive knowledge of Paddle Tramps's use of their trademarks because of Paddle Tramps's long history of producing and advertising products containing their marks.

The first letter regarding licensing was sent to Paddle Tramps in 1990 by an organization known as "Greek Properties," which represented six of the Greek Organizations. The letter invited Paddle Tramps to become licensed with the Greek Organizations. Paddle Tramps contends that this was the first that they had heard of Greek Organizations licensing their marks. Paddle Tramps ignored the letter and continued its business. Greek Properties sent a second letter in May 1991,

purporting to represent the same Greek Organizations and two additional ones, again inviting Paddle Tramps to become licensed. Kenneth Abraham was present at a meeting regarding licensing between various vendors and Greek Properties held in June 1991, where he expressed his belief that vendors need not be licensed and disagreed with Greek Properties' contention that licensing was a positive development for the industry. There were no further communications from the Greek Properties entity.

Paddle Tramps received communications from Sigma Chi in 1994, 1995, and 1998, seeking Paddle Tramps to become licensed. Paddle Tramps did not respond to Sigma Chi's requests. Paddle Tramps received a complaint from Pi Kappa Alpha in 1996, asking Paddle Tramps to cease using its marks. Representatives of Pi Kappa Alpha and Paddle Tramps discussed this request in July 1996. Although Paddle Tramps disagreed that it was required to be licensed to use Pi Kappa Alpha's marks, Paddle Tramps agreed to cease using an image adorned with Pi Kappa Alpha's name and symbols in its print advertising in a newspaper known as the Campus Chronicle.

Besides these communications with Sigma Chi and Pi Kappa Alpha, Paddle Tramps did not receive communications on behalf of multiple Greek Properties inviting them to become licensed again for the next several years. Mark Shaver founded AMC in 1997, and several of the Greek Organizations hired AMC to handle their licensing efforts. In February 1998, Paddle Tramps received a letter from AMC, representing four Greek Organizations, inviting Paddle Tramps to become licensed. Paddle Tramps did not respond to this letter, AMC sent similar letters to Paddle Tramps in July and November of 1998. Paddle Tramps again did not respond to these letters. In May 2000, Sigma Chi again contacted Paddle Tramps, informing it of Sigma Chi and other Greek Organizations' involvement with AMC, and again inviting it to become licensed. Paddle Tramps ignored the letter.

In August 2000, AMC sent a letter to Paddle Tramps demanding it to cease and desist using the marks of the Greek Organizations it represented, which by this point included Alpha Tau Omega, Delta Tau Delta, Delta Delta Delta, Kappa Delta, Kappa Sigma, Sigma Phi Epsilon, and Sigma Kappa. Paddle Tramps ignored this letter and did not halt its manufacture and distribution of merchandise with these Greek Organizations' marks. Paddle Tramps also ignored a follow-up letter sent in August 2001. In September 2002, AMC sent an additional email informing Paddle Tramps of an Eleventh Circuit decision affecting licensing rights.[4]

AMC sent a cease and desist letter on behalf of its clients in June 2003, and, after receiving no response, sent another cease and desist letter in January 2004, which was again ignored. After following up via letter and email in July 2004 and January 2005 and again receiving no response, AMC's law firm, Stites & Harbison PLLC, took over communications with Paddle Tramps in September 2006, in which they again demanded Paddle Tramps cease and desist using their marks. By this time, AMC represented all of the Greek Organizations who are parties in this case. Paddle Tramps continued their activities upon receiving these cease and desist letters, and insisted that it had the right to continue using the Greek Organizations' marks without a license.

4. The case that AMC mentioned in its email is Sigma Chi Fraternity v. Sethscot Collection, No. 98–2102–CIV–SEITZ, 2000 WL 34414961, at *10–*11, 2000 U.S. Dist. LEXIS 6332, at *33–*34 (S.D.Fla. Apr. 7, 2000), aff'd 48 Fed.Appx. 739 (11th Cir.2002).

## E. The Instant Litigation

After continued communications between counsel for the Greek Organizations and Paddle Tramps and its representatives, Paddle Tramps filed suit in this Court on April 3, 2008, seeking a declaratory judgment determining that its use of the marks was not trademark infringement. The Greek Organizations filed its answer and counterclaims on May 30, 2008, asserting counterclaims against Paddle Tramps for trademark infringement, unfair competition, and trademark dilution. The parties each filed Motions for Summary Judgment in November 2010. In their Motion for Summary Judgment, the Greek Organizations argued that there was no genuine issue of material fact concerning the merits of their claims for trademark infringement, unfair competition, and trademark dilution. The Court granted their Motion in relevant part on April 26, 2011, 781 F.Supp.2d 396, 2011 WL 1661410 (N.D.Tex.2011), determining that Paddle Tramps's use of the Greek Organizations' marks did constitute trademark infringement, unfair competition, and trademark dilution. However, the Court did not issue a decision on Paddle Tramps's Motion for Summary Judgment, which argued that even if Paddle Tramps had committed trademark infringement, the Greek Organizations' claims were barred by laches and acquiescence. The Court denied the Greek Organizations' Motion for Summary Judgment without prejudice in regard to its request for an injunction pending a decision on Paddle Tramps's Motion for Summary Judgment, and set a hearing for May 26, 2011 to hear arguments concerning Paddle Tramps's defenses of laches and acquiescence.

The respective positions of Paddle Tramps and the Greek Organizations can be summed up as follows. Paddle Tramps contends that the Greek Organizations' delay and apparent toleration (or in at least one case encouragement) of its use of the marks over the preceding decades should prevent the Greek Organizations from enforcing their marks at this time. This view is primarily expressed in Paddle Tramps's Motion for Summary Judgment, which seeks to block the Greek Organizations' claims through the defenses of laches and acquiescence. Paddle Tramps is also virulently opposed to the Greek Organizations' claims that it has a right to license the use of their names, insignia, or symbols, despite the fact that many of those symbols are trademarked. This view is evidenced by Paddle Tramps's consistent disapproval of the Greek Organizations' attempts to license their trademarks with vendors such as itself since the early 1990s, and of its consistently ignoring the Greek Organizations' communications requesting them to apply for licenses or cease and desist using their marks.

In their Response, the Greek Organizations argue that Paddle Tramps cannot raise these defenses because, as an intentional infringer, it does not possess the clean hands necessary to access equitable defenses. The Greek Organizations further contend that, regardless of whether the Court finds in favor of Paddle Tramps in regard to laches and acquiescence, they have the right to seek an injunction to prevent Paddle Tramps from using their trademarks without a license.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Willis v. Coca Cola Enters., Inc.,* 445 F.3d 413, 416 (5th Cir. 2006). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for

the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party who bears the burden of proof ·at trial must go beyond the pleadings and present specific facts indicating a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir.2006). Summary judgment can be appropriate if the non-moving party "fails to make a showing sufficient to establish the existence of an essential element to that party's case." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. At this stage, all evidence and reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). "In determining whether there is substantial evidence to create a jury question, [the Court] is not free to weigh conflicting evidence and inferences, determine the credibility of witnesses, or substitute [its] judgment of the facts for that of the jury." *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1387 (5th Cir.1996).

### III. Paddle Tramp s's Ability to Access Equitable Defenses

■ Laches is defined as an inexcusable delay that results in prejudice to a defendant. *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985). To demonstrate laches, Paddle Tramps must show (1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 668 (5th Cir.2000). A district court enjoys considerable discretion in deciding whether to apply the doctrine of laches. *National Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 707 (5th Cir.1994).

However, such discretion exists "to the extent the facts relevant to laches are undisputed on summary judgment." *Id.* "[A]cquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induces reliance by the defendant." *Conan Props.*, 752 F.2d at 153. "As affirmative defenses, [Paddle Tramps] must prove how it will be prejudiced by the· [Greek Organizations'] unreasonable delay and implicit or explicit assurances." *Id.*

However, both of these defenses are equitable defenses, and before determining whether Paddle Tramps has successfully demonstrated the defenses of laches and acquiescence, the Court must determine whether Paddle Tramps is barred from asserting these defenses due to unclean hands. *See Carmona v. Rubio*, No. H–06–228, 2007 WL 543438, at *5 (S.D.Tex. Feb. 16, 2007) (Atlas, J.) ("As a threshold matter, a defendant with 'unclean hands' may not prevail on the equitable defense of laches."); 4 CALLMAN ON UNFAIR COMPETITION, TRADEMARKS, AND MONOPOLIES § 23.26 (4th ed. 2010) ("Intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense, not a mere factor weighed in balancing the equities.").

The Fifth Circuit has addressed the issue of unclean hands barring the assertion of the defenses of laches and acquiescence on several occasions, and the parties dispute how the Fifth Circuit's precedent should be applied. The first case of importance to come before the Fifth Circuit was *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 (5th Cir.1985). In *Conan Properties*, the defendants opened a restaurant in Austin, Texas called "Conans Pizza," and their promotions and decorations featured a barbarian-like man that looked similar to the character of Conan the Barbarian, which was owned by

an entity affiliated with its creator's estate and an author that wrote stories about the character. *Id.* at 148. The owner of the "CONAN THE BARBARIAN" mark sued, and the defendants raised the defenses of laches and acquiescence. *Id.* at 147. The owner of the mark asserted that the owners of "Conans Pizza" were intentional infringers who possessed unclean hands and could not assert those equitable defenses.

Addressing this issue, the Fifth Circuit stated, "To foreclose the laches and acquiescence defenses, the plaintiff must offer something more than mere objective evidence to demonstrate that the defendant employed the allegedly infringing mark with the wrongful intent of capitalizing on its goodwill." *Id.* at 150. The Fifth Circuit held that the defendants did not possess unclean hands and were therefore not foreclosed from the defenses of laches and acquiescence, determining, "Although there appears to be little doubt that Conans intended to use the CONAN THE BARBARIAN mark and image, sufficient doubt exists regarding whether that use was designed to capitalize on CPI's goodwill." *Id.* at 151. The *Conan Properties* court elaborated, "The issue in this case is not whether Conans intended to use the CONAN THE BARBARIAN mark and image but whether Conans intended to derive benefit from and capitalize on CPI's goodwill in the CONAN character by using the mark in the manner in which it did." *Id.* at 151 n. 2. The evidence before the district court in that case included the defendants' testimony that, although they were aware of the character's existence, they adopted the mark because they liked the way the word sounded in their jingle and that it would be a clever and unique way of marketing their service and product. *Id.* at 151. Furthermore, the defendants believed that the character was neither well known nor popular in Austin, and that they were aware of no other food product that used the CONAN mark or image. *Id.* Additionally, the use of the mark in the food industry was different from its traditional use as an entertainment icon. The Fifth Circuit accordingly held that the plaintiffs had not met their burden of proving that the defendants subjectively and knowingly intended to use the mark for the purpose of deriving benefit from the plaintiffs' goodwill. *Id.*

The Fifth Circuit addressed this issue once again in *Board of Supervisors for Louisiana State University Agricultural & Mechanical College v. Smack Apparel*, 550 F.3d 465 (5th Cir.2008). In *Smack Apparel*, an apparel company was manufacturing, marketing, and selling t-shirts containing the color schemes of several large universities and certain phrases closely identified with the success of those universities' football teams. *Id.* at 472–73. The apparel company did not have a license or permission from the universities to sell these products. *Id.* at 472. The universities sued the apparel company, seeking to enjoin them from making and selling t-shirts with these indicators on them. The apparel company asserted that because members of the Louisiana State University athletic department purchased several of their shirts years before litigation began and did not protest, laches barred LSU from asserting claims of infringement. *Id.* at 489.

The Fifth Circuit affirmed the district court's determination that the apparel company did not have the clean hands necessary to assert the defense of laches. Citing *Conan Properties*, the Fifth Circuit held, "A defendant who intentionally infringes a trademark with the bad faith intent to capitalize on the markholder's good will lacks the clean hands necessary to assert the equitable defense [of laches]." *Id.* at 490. In affirming the district court's decision, the Fifth Circuit distinguished

the situation before it from *Conan Properties*, writing,

> In *Conan Properties*, we held that although a defendant's intentional use of a plaintiff's mark may give rise to "a presumption that the defendant intended to cause public confusion as to the source or sponsorship of the product," such an intentional use "does not give rise to a presumption that the defendant intended to appropriate the plaintiff's good will." Unlike *Conan Properties*, the record here establishes the substantive and knowing bad faith necessary to foreclose an equitable defense. Smack did not simply admit that it knew the plaintiff Universities used marks similar to its own. Rather, it admitted that it intentionally incorporated the Universities' color schemes and other indicia in order to specifically call the Universities to the public's mind, thus deriving a benefit from the Universities' reputation. The district court properly declined to apply the defense of laches.

*Id.* (footnotes omitted).

■ *Smack Apparel* thus holds that there are different standards of intent that a court must apply when discussing whether there was infringement as opposed to whether an infringer has unclean hands. To possess the unclean hands necessary to bar the assertion of the defense of laches, *Smack Apparel* provides that the infringer must have a bad faith intent to capitalize or appropriate the markholder's good will. *Id.* In *Smack Apparel*, an admission that the apparel company used the universities' marks to call those universities to the public's mind, and therefore derive a benefit from their reputation, supported the determination that the infringer possessed unclean hands. *Id.* This differed from *Conan Properties*, in which an infringer could access the defense of laches because there was evidence that the infringer, despite a prior awareness of the mark, did not use the mark in the same field as the markholder used it in, adopted it for the purported reason that it sounded good in an advertising jingle, and believed that the mark was not well known in the market. *Conan Props.*, 752 F.2d at 151.

■ Drawing from these precedents, it is clear that one who intentionally infringes a trademark with the bad faith intent to capitalize on the mark-holder's goodwill lacks the clean hands necessary to assert the equitable defense of laches. *Smack Apparel*, 550 F.3d at 490. The Greek Organizations' "heavy burden" of proving that Paddle Tramps's hands were unclean requires them to present subjective, rather than objective, evidence that Paddle Tramps knowingly intended to use the Greek Organizations' marks for the purpose of deriving benefit from the Greek Organizations' goodwill. *Conan Props.*, 752 F.2d at 150–51. Whether Paddle Tramps has unclean hands is a question of fact; should a genuine issue of material fact exist as to Paddle Tramps's intent to derive benefit from the Greek Organizations' goodwill, the matter should be resolved by a jury. *Ironclad, L.P. v. Poly-America, Inc.*, No. 3:98–CV–2600P, 1999 WL 826946, at *8 (N.D.Tex. Oct. 14, 1999) (Solis, J.).

The Greek Organizations contend that the facts of this case are analogous to those seen in *Smack Apparel*, and that this Court should reach the similar conclusion that Paddle Tramps lacks the clean hands necessary to assert equitable defenses. However, this situation is distinguishable from that seen in *Smack Apparel* in several respects. For example, the Greek Organizations have not provided the Court with undisputed evidence of Paddle Tramps's bad faith intent to use the Greek Organizations' marks to derive benefit from the Greek Organizations' goodwill. In *Smack Apparel*, the Fifth Circuit up-

held the district court's determination that laches was barred because Smack Apparel "admitted that it intentionally incorporated the Universities' color schemes and other indicia in order to specifically call the Universities to the public's mind, thus deriving a benefit from the Universities' reputation." *Smack Apparel,* 550 F.3d at 490. While it is true that Paddle Tramps has purposely used the Greek Organizations' marks, Paddle Tramps's intent is not nearly as clear as it was in *Smack Apparel.* In *Smack Apparel,* the Fifth Circuit concluded, based on the statements of an officer of the accused infringer that the similarity of the marks was "no coincidence" and that he designed the shirts to make people think of the mark owners, that "Smack intended to capitalize on the potential for confusion," *Id.* at 482. However, the Fifth Circuit recognized the possibility of an alternative intent that differs from an intent to capitalize: "Smack did not hope to sell its t-shirts because of some competitive difference in quality or design compared with the Universities' licensed products, but rather it intended to take advantage of the popularity of the Universities' football programs and the appearance of the school teams in the college bowl games." *Id.* at 482 (referencing *University of Ga. Athletic Assoc. v. Laite,* 756 F.2d 1535, 1545 (11th Cir.1985)).

In this case, Paddle Tramps has presented evidence of an alternative intent other than capitalizing on the Greek Organizations goodwill, as well as evidence of circumstances where that alternative intent is plausible. *See Sno–Wizard Mfg., Inc. v. Eisemann Prods. Co.,* 791 F.2d 423, 428 (5th Cir.1986) (holding that a plausible explanation for the copying of a trade dress demonstrated an intent other than " 'cashing in' on the plaintiff's good will"). In many other cases involving the use of marks for universities or sports teams, the infringement began long after there was an established market for the goods or mark at issue. *See Smack Apparel,* 550 F.3d at 472 (infringing t-shirts sold to take advantage of universities' marks that had been licensed to be sold in the same manner for decades); *Laite,* 756 F.2d at 1545 (use of the University of Georgia's mark "because the cans would catch the attention of University of Georgia football fans"); *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1008 (5th Cir.1975) (use of the marks of National Hockey League teams on patches years after the marks had been used on similar products). In this case, Paddle Tramps has provided evidence indicating that at the time of Paddle Tramps's founding, there was an extremely limited or no market for selling components of fraternity or sorority paddles; Paddle Tramps had started using the marks in an area and market where there were no or few alternatives or ability of Greek Organization members to purchase the products that it was producing. The Court believes that this is sufficient evidence for a jury to conclude that Paddle Tramps was founded with the intent to provide a product to individuals who previously had no opportunity to obtain such a product, not with the intent to capitalize on the Greek Organizations' goodwill. *See Sno–Wizard,* 791 F.2d at 428 (holding that a "desire to provide interchangeable parts and repair the machines" for individuals unable to obtain such services from a mark owner demonstrated an intent of the alleged infringer that was different from an intent to pass off). While it is clear that Kenneth Abraham intended to use the Greek Organizations' trademarks, there is evidence to suggest that he did not, at that point, possess a bad faith intent to benefit from the Greek Organizations' goodwill. *See Conan Props.,* 752 F.2d at 151 (distinguishing intent to use a mark from intent to capitalize on a mark owner's goodwill); *see also* 4 CALLMAN ON UNFAIR COMPETITION, TRADE-

MARKS, AND MONOPOLIES § 23.26 (4th ed. 2010) (noting that an alleged intentional infringer may be still be able to assert laches if he had "good reason to believe that his act did not constitute an infringement, or a valid reason to rely on the acquiescence of the plaintiff.").

The Greek Organizations frequently cite statements of Paddle Tramps's founder and a current officer as evidence of impermissible intent. Paddle Tramps's founder, Kenneth Abraham, testified that new members of these organizations are "really excited, and they want stuff bearing the insignia and crests of their respective fraternity or sorority, and they buy these items to "celebrate their involvement" with their fraternity or sorority. Def.'s App., Docket No. 55, at 34–36, Kenneth Abraham Dep. at 180–82. Kyle Abraham, a current officer of Paddle Tramps, further testified, "[O]ne of the joys of being in a fraternity is ... getting a bid and going and buying all of the cool stuff you can get with your ... fraternity's crest and things on it." Def.'s App., Docket No. 55, at 63, Kyle Abraham Dep. at 208. The Court is of the opinion that a jury could interpret this testimony as evincing an intent to provide a service for members of Greek Organizations, not necessarily to capitalize upon the Greek Organizations' goodwill. As the jury, not the judge, has "the exclusive authority to assess the credibility of witnesses," Brady v. Fort Bend Cnty., 145 F.3d 691, 714 (5th Cir.1998), it would not be appropriate for the Court to grant summary judgment based on these statements, which could be subject to different interpretations.

█ The Greek Organizations further argue that the Court should find the intent sufficient to bar the assertion of laches and acquiescence because of the similarity of the marks at issue in this case and the fact that the products are sold in the same market. Like the alleged infringer in Smack Apparel, Paddle Tramps is using the Greek Organizations' marks in the very same field in which licensed products are used. Smack Apparel, 550 F.3d at 472–74. As one prominent treatise noted, an infringer cannot assert that it possessed good faith "when the marks and goods involved are identical and the goods are sold through the same channels to the same purchasers for the same use." 4 CALLMAN ON UNFAIR COMPETITION, TRADEMARKS, AND MONOPOLIES § 23.26 n. 14 (4th ed. 2010) (citing Chun King Corp. v. Genii Plant Line, Inc., 56 C.C.P.A. 740, 403 F.2d 274, 276 (1968)); see generally PIU Mgmt., LLC v. Inflatable Zone Inc., No. H–08–2719, 2010 WL 681914, at *4–*5 (S.D.Tex. Feb. 25, 2010) (Miller, J.) (wrongful intent inferred when infringer used similar mark in the same market aimed at the same customers).

The Greek Organizations are the sources of the marks used by Paddle Tramps. However, the unique facts of this case provide a rare situation in which the use of similar marks in the same field do not necessarily demonstrate the intent that would bar the assertion of equitable defenses. The use of similar or near-identical marks in the same field is strong evidence of an intent to capitalize on the goodwill of the marks' owners. Exxon Corp. v. Humble Exploration Co., Inc., 524 F.Supp. 450, 462–63 (N.D.Tex.1981) (Robinson, J.), reversed on other grounds, 695 F.2d 96 (5th Cir.1983) (holding that a court may infer wrongful intent where an alleged infringer knowingly uses or adopts a mark with full knowledge of another's identical or clearly similar mark). In this case, however, there is also strong evidence that these marks were not adopted to capitalize on the Greek Organizations' goodwill, but to provide a service that was previously unavailable or extremely inconvenient to members of Greek Organizations who needed to construct or decorate

ceremonial paddles. Taking the evidence submitted by Paddle Tramps as true, this business began and expanded before a burgeoning market for such merchandise developed and properly licensed products were in direct competition with Paddle Tramps's unlicensed products. In the opinion of the Court, these circumstances distinguish this case from one such as *Smack Apparel*, in which the mark was adopted in a specific market that was already widespread and developed and where there was an admitted potential to profit from the adoption of the marks in the manner in which they were used. *Smack Apparel*, 550 F.3d at 490; *see also Conan Props.*, 752 F.2d at 150–51 (allowing the assertion of equitable defenses when there was evidence that the alleged infringer had motivations for its use of the "CONAN THE BARBARIAN" mark that were not explicitly meant to benefit from that mark's goodwill).

The Court takes into serious consideration the fact that Paddle Tramps is using virtually identical marks to the Greek Organizations' marks on products sold in the same market as properly licensed products. However, the Court is of the opinion that the facts and circumstances of this case are very unique and weigh against holding that Paddle Tramps's access to equitable defenses is barred without the input of a jury. While it is clear that the marks belong to and originate from the Greek Organizations, Paddle Tramps has provided evidence that there was no market or organizational model by which these marks were utilized by the Greek Organizations to sell affinity products at the time of Paddle Tramps's founding; indeed, Paddle Tramps's evidence supports their contention that Kenneth Abraham was merely taking advantage of an untapped market. Thus, there is a genuine issue of material fact regarding whether Paddle Tramps possessed a bad faith intent to capitalize on the Greek Organizations' goodwill. In

determining both whether Paddle Tramps possesses unclean hands and what equitable remedy, if any, should be fashioned in this case, perhaps the most important consideration that the Court will have to take into account is the intent of Paddle Tramps and Kenneth Abraham. As there are significant factual issues surrounding the nature of that intent, the Court is convinced that the question of Paddle Tramps's intent should be submitted to a jury rather than resolved by summary judgment. *See National Ass'n of Gov't Emps.*, 40 F.3d at 707 (holding that a court's discretion in deciding whether to apply the doctrine of laches exists only "to the extent the facts relevant to laches are undisputed on summary judgment"); *Ironclad*, 1999 WL 826946 at *8 ("If the jury finds that Defendant acted with unclean hands, Poly–America will be precluded from presenting its equitable defenses of laches and acquiescence.").

In sum, Paddle Tramps has provided evidence that could indicate to a jury that Kenneth Abraham's intent upon starting the business was to tap into a market that was at the time practically nonexistent, and that he also had the intent to provide members of Greek Organizations with an easier and effective way to construct paddles for the pledging process. The Court is of the opinion that a reasonable jury, upon viewing this evidence, could conclude that Paddle Tramps possessed an intent to use the Greek Organizations' marks, but did not possess a bad faith intent to capitalize upon the Greek Organizations' good will. Of course, a jury may find that Kenneth Abraham did possess such intent, or that such intent developed at some point in Paddle Tramps's existence, such as once Kenneth Abraham became aware of the Greek Organizations' rights. *See PIU Mgmt., LLC v. Inflatable Zone Inc.*, No. H–08–2719, 2010 WL 681914, at *5 (S.D.Tex. Feb. 25, 2010) (Miller, J.) (noting

that the court was "convinced that [the defendant] intended, *if not initially certainly at some relevant time*, to exploit the Plaintiffs' trademarks" when, among other actions, the defendant "continued to use the accused mark after notice of potential infringement by Plaintiffs" and "refused to cease using the name after . negotiations with Plaintiffs because he was 'doing great,' making money, and was 'offered nothing of value' in return" for ceasing the infringing behavior) (emphasis added); *see also* 4 CALLMAN ON UNFAIR COMPETITION, TRADEMARKS, AND MONOPOLIES § 23.26 (4th ed. 2010) ("[E]ven a defendant who initially was unaware of the plaintiff's rights can become an intentional infringer, and thus ineligible to assert the laches defense, if he continues to infringe after becoming aware."). However, because the facts surrounding the actual intent of Paddle Tramps and Kenneth Abraham are disputed, not just initially but later in Paddle Tramps's existence, the Court is of the opinion that a factfinder's input is essential to its determination of whether Paddle Tramps possessed intent sufficient to bar the assertion of equitable defenses.

Professor McCarthy noted the importance of an intensive factual inquiry in addressing this issue:

What kind of state of mind or acts of imitation will suffice to constitute bad faith or deliberate infringement so as to preclude a laches defense? Finding the answer to this question *requires a highly fact intensive weighing of the equities of the case.* .

MCCARTHY ON TRADEMARKS § 31:9 (emphasis added) (footnotes omitted). In the opinion of the Court, a jury's consideration is essential to the relevant issues that the Court must take into account in determining whether Paddle Tramps possesses un-

clean hands. It is therefore clear to the Court that a genuine issue of material fact exists over the intent of Kenneth Abraham, and whether that intent was to capitalize upon the Greek Organizations' goodwill.

## IV. Laches and Acquiescence

Having determined that there are issues of fact that preclude summary judgment on the issue of unclean hands, the Court now moves to the merits of Paddle Tramps's laches and acquiescence defenses. The Court shall address each of these equitable defenses in turn.

### A. Laches

As noted above, to demonstrate laches, Paddle Tramps must show (1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay. *Westchester Media,* 214 F.3d at 668.

■ In their briefs, the Greek Organizations generally do not challenge the substance of Paddle Tramps's defense of laches, instead focusing on whether Paddle Tramps possesses unclean hands. Indeed, at the hearing, the Greek Organizations noted to the Court that they likely would not challenge the substantive portions of these equitable defenses. Based on the evidence presented to the Court, it is clear that if Paddle Tramps can assert the defense of laches, there is no genuine issue of material fact regarding whether it would be effective in this case.[5]

■ The Greek Organizations all delayed in asserting their trademark rights. The period of delay for measuring laches begins at the time when the plaintiff knew

---

**5.** The Greek Organizations appeared to agree with this assessment at the hearing without actually conceding that they had no substan-

tive argument countering the merits of the laches defense.

or should have known of the infringement. *American Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321, 334 (5th Cir.2008); *Armco, Inc. v. Armco Burglar Alarm Co., Inc.,* 693 F.2d 1155, 1161 (5th Cir.1982). Paddle Tramps has provided information indicating that all of the Greek Organizations knew of Paddle Tramps's infringement long before suit was filed. For example, Delta Delta Delta was aware of Paddle Tramps's activities as early as the late 1960s through selling some of its products at a convention. Paddle Tramps also presented its products at conventions and participated in advertising and events in venues where the Greek Organizations could have become aware of its infringing activities. Additionally, nearly all of the Greek Organizations participated in sending cease and desist letters to Paddle Tramps throughout the 1990s and 2000s; however, their claims were not raised in this suit until 2008. Such behavior demonstrates the Greek Organizations' awareness of Paddle Tramps's infringement for the purpose of laches. *See Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n,* 465 F.3d 1102, 1109 (9th Cir.2006) ("A plaintiff is certainly put on notice [for the purposes of laches] where for many years the parties had plants in the same cities and plaintiff had business contacts with defendants."); *see also H.G. Shopping Centers, L.P. v. Birney,* No. H–99–0622, 2000 WL 33538621, at *6 (S.D.Tex. Nov. 29, 2000) (Johnson, J.) (, holding that, in a case in which intermittent cease and desist letters were sent over a 20 year period but no legal action was taken a mark-owner had notice of an infringer's use of its mark on the date of its first cease and desist letter). While the periods of delay vary regarding certain Greek Organizations, it is clear that they all waited a substantial amount of time, ranging from four years to several decades, to file their claims.[6] Because the Greek Organizations waited this lengthy amount of time to assert their rights, the first element of laches is met. *Tillamook,* 465 F.3d at 1105 (26 years); *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1083 (5th Cir.1997) (over 20 years); *Birney,* 2000 WL 33538621 at *9 (over 20 years).

The second element of laches is whether there is a lack of excuse for the delay. The Court is of the opinion that the Greek Organizations have successfully created an issue of fact as to this element. The Greek Organizations have noted two separate reasons for their delay, both of which the Court is convinced create an issue of fact for a jury's consideration. First, the Greek Organizations reference a specific kind of infringement that has only arisen more recently: the selling of "paddle kits" using the Greek Organizations' names through Paddle Tramps's website. This practice began in 2001, and in the ensuing years the Greek Organizations intensified their efforts to get Paddle Tramps to stop its infringing behavior, culminating in the sending of cease and desist letters and litigation.

■■ This first argument goes hand-in-hand with the Greek Organizations' arguments regarding progressive encroachment. The doctrine of progressive encroachment, which has not been adopted in the Fifth Circuit but has been identified and used by district courts in this circuit, "may provide an excuse for an otherwise reasonable delay." *Just Add Water, Inc. v. Everything But Water, Inc.,* No. 3:04–cv–2085–H, 2005 WL 1206874, at *3

6. However, the actual length of time or the starting point at which the laches period should begin for Greek Organizations that should have known (rather than actually knew) of the infringement is a question of fact, which would be useful to the Court's fashioning of an equitable remedy, should the parties ask a jury to resolve that question.

(N.D.Tex. May 18, 2005) (Sanders, J.). The doctrine provides that "where a defendant begins use of a trademark or trade dress in the market, and then directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff, the plaintiff's delay is excused." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 794 (7th Cir.2002) (quoting *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1205 (11th Cir.1997)). The Greek Organizations contend that Paddle Tramps's expansion of its business from wholesaling and selling its infringing products to retail vendors to selling "paddle kits" to individual consumers online was a progressive encroachment upon the Greek Organizations' marks that became markedly more impermissible after these new activities began in 2001.

Paddle Tramps argues that the sale of its items online in a "paddle kit" beginning in 2001 did not amount to progressive encroachment, but rather was a natural evolution of its business with the advent of the internet. In support of this argument, Paddle Tramps refers the Court to *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F.Supp.2d 1096 (N.D.Cal.2008). In *Wozniak*, the mark owner knew about an infringer's use of its mark for 18 years before filing suit. *Id.* at 1111. The mark owner argued that the infringer's expansion of its business to the internet thrust it into a new national marketplace, giving rise to progressive encroachment. The *Wozniak* court rejected this argument, holding that "simply adopting a new form of technology as it comes into being does not constitute progressive encroachment." *Id.* at 1115. Paddle Tramps contends that selling "paddle kits" is equivalent to selling items identified with individual Greek Organizations in a catalog, which Paddle Tramps did prior to its internet sales activities, and that its expansion to the internet is a natural evolution of its business rather

than an expansion that would invoke the doctrine of progressive encroachment.

■ The Court is of the opinion that there are issues of fact regarding whether Paddle Tramps committed progressive encroachment. The doctrine of progressive encroachment does not apply to "normal business growth." *See Tillamook*, 465 F.3d at 1110 ("A junior user's growth of its existing business and the concomitant increase in the use of the mark do not constitute progressive encroachment."). As the *Wozniak* court recognized, a business's adoption of its selling practices to the internet on its own would constitute normal business growth and would not implicate the doctrine of progressive encroachment. *Wozniak*, 627 F.Supp.2d at 1115. In this case, however, there are several factual circumstances that could implicate progressive encroachment. First, Paddle Tramps did not just expand its business to the internet; it actually purchased internet keywords on search engines containing the Greek Organizations' marks, a tactic that was not possible in using catalogs or other pre-internet sales materials. Second, at the time of the expansion of Paddle Tramps's business to the internet, Paddle Tramps had received cease and desist letters from various Greek Organizations, and was therefore aware of the Greek Organizations' rights and their objections to Paddle Tramps's infringing behavior. The Fifth Circuit has long recognized that actions taken after the receipt of a cease and desist letter have an important impact on a court of equity's decision in a trademark infringement case. *See Conan Props.*, 752 F.2d at 152–53 (allowing injunctive relief to stop infringement in a geographic market beyond the market that the mark owner had acquiesced to when the infringement in the subsequent market took place after the receipt of a cease and desist letter); *see*

*also Elvis Presley Enters. v. Capece,* 141 F.3d 188, 205 (5th Cir.1998) ("Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts."). A jury could determine that this was not "normal business growth," but an expansion that "placed [Paddle Tramps's products] more squarely in competition" with the Greek Organizations' products, therefore rising to the level of progressive encroachment. *Kason Indus.,* 120 F.3d at 1205. Accordingly, a genuine issue of material fact exists in regard to this issue.

Second, the parties have referenced other litigation involving the Greek Organizations that has taken place elsewhere in the country over the issues before the Court and issues related to unlicensed use of the Greek Organizations' trademarks. The Greek Organizations have asserted that the reason that they did not bring a case sooner was because of the time needed to become organized and combating other cases of infringement separately since banding together to protect their marks. Deferring the present claims pending the completion of other litigation may, in the mind of a reasonable jury, create an excuse for the delay, particularly when some of the infringement challenged by the Greek Organizations only came about over the last decade. *See Electronic Commc'ns, Inc. v. Electronic Components for Indus. Co.,* 443 F.2d 487, 491 (8th Cir.1971) (upholding a district court's excusal of a delay in bringing an infringement action when other litigation was taking place); *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.,* 457 F.Supp. 1090, 1097 n. 28 (S.D.N.Y.1978) ("[A] trademark owner is not bound to take on more than one infringer at a time.").

The third element of laches is whether Paddle Tramps was unduly prejudiced by the Greek Organizations' delay. The Court is of the opinion that there are clearly issues of fact on this point. First, Paddle Tramps contends that its business grew to the standing it is today as a result of the Greek Organizations' failure to enforce their marks, and that Paddle Tramps would have never reinvested insurance proceeds from natural disasters and fires in 1966, 1970, and 1980 if the Greek Organizations had made Paddle Tramps aware of its infringing activities. Paddle Tramps accordingly contends that the Greek Organizations' inaction permitted it to build up its business without any interruption or significant protest, and the Greek Organizations' success on its claims at this time would result in severe economic prejudice to Paddle Tramps. *See Chattanoga Mfg.,* 301 F.3d at 795 ("Prejudice may be shown if the plaintiff's unexcused failure to exercise its rights caused the defendant to rely to its detriment and build up a valuable business around its trademark."); *Save Our Wetlands, Inc. (SOWL) v. U.S. Army Corps of Eng'rs,* 549 F.2d 1021, 1028 (5th Cir.1977) (expenditures in reliance upon inexcusable delay relevant to balancing the equities in determining undue prejudice for purposes of laches inquiry); *Ray Commc'ns, Inc. v. Clear Channel Commc'ns,* 760 F.Supp.2d 544, 553 (E.D.N.C.2010) ("A defendant suffers undue economic prejudice when it relies on the trademark holder's inaction, which permits the defendant to build up a valuable business around the trademark."). Paddle Tramps also alleges that it continued its business and infringing activities after receiving numerous threats of legal action in cease and desist letters from the Greek Organizations that were never followed up on. Paddle Tramps asserts that it relied on the Greek Organizations' inaction in continuing its activities and business growth, which would support a finding of undue prejudice for the purposes of laches. *See Birney,* 2000 WL 33538621 at *10 (holding that a plaintiff's pattern of send-

ing cease and desist letters but not following up on threats to pursue legal action "misled the Defendants into believing it would not sue," supporting a finding of prejudice to the infringer).

The Greek Organizations counter these assertions by disputing the significance of these insurance proceeds and challenging the credibility of the statements to these effects of Kenneth Abraham. As determining the credibility of witnesses is an issue for a jury to decide, *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1387 (5th Cir.1996), summary judgment would be improper for this reason alone. Second, the Greek Organizations contend that the sales that would be affected by the issuance of an injunction would be a mere 2.4% of Paddle Tramps's business, while Paddle Tramps contends that the business it has developed based around the use of the marks would be far greater. Again, the degree of prejudice to Paddle Tramps, and whether it rises to the level of undue prejudice, is heavily dependent upon this factual determination.

For all of the aforementioned reasons, the Court shall not grant summary judgment on the defense of laches.

### B. Acquiescence

 "[A]cquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induces reliance by the defendant." *Conan Props.*, 752 F.2d at 153; *see also Coca–Cola Co. v. Boston's Bar Supply*, 124 F.3d 192, 1997 WL 533180, at *2 (5th Cir.1997) (describing the Fifth Circuit's approach to laches as "passive," as opposed to the Eleventh Circuit, and emphasizing that active representation by a mark owner that it would not assert a claim is unnecessary to assert acquiescence under Fifth Circuit precedent). "In order to establish the defense of acquiescence, a defendant must prove that: (1) the plaintiff knew or should have known of the defendant's use of the trademark; (2) the plaintiff made implicit or explicit assurances to the defendant; and (3) the defendant relied on the assurances." *Board of Regents, Univ. of Tex. Sys. v. KST Elec., Ltd.*, 550 F.Supp.2d 657, 664–65 (W.D.Tex. 2008) (Yeakel, J.).

Paddle Tramps asserts that certain actions by several of the Greek Organizations amount to explicit assurances that induced reliance. According to Paddle Tramps, Delta Delta Delta owns a shop called "Delta Shop" that is run by an alumnus of the sorority. Delta Shop solicited Paddle Tramps to provide products for Delta Delta Delta's 1968, 1970, and 1972 conventions. According to Paddle Tramps, Mrs. T.N. Bowdle, Delta Shop's chairperson, sent thank you notes to Kenneth Abraham and continued to encourage sales to Delta Delta Delta members, some of which were placed with Paddle Tramps directly. Paddle Tramps alleges that this encouragement served as an explicit assurance that Delta Delta Delta acquiesced to Paddle Tramps's use of its marks.

Paddle Tramps also argues that Pi Kappa Alpha has provided explicit assurances sufficient to satisfy acquiescence in two ways. First, Pi Kappa Alpha has ordered generic candle holders without any use of their marks from Paddle Tramps since 1996. While these items were not infringing items, Paddle Tramps claims that Pi Kappa Alpha's business dealings with Paddle Tramps indicates acquiescence to sales of other infringing items. Second, Pi Kappa Alpha sent a cease and desist letter to Paddle Tramps in 1995 regarding the presence of Pi Kappa Alpha marks in an advertisement in a newsletter, the *Campus Chronicle*, which contained an image of a Pi Kappa Alpha paddle. Kyle Abraham, an officer of Paddle Tramps, called a Pi Kappa Alpha employee, Scott Russell, and offered to stop using the offending mark in

the advertisement, but said Paddle Tramps would not cease making and selling products containing Pi Kappa Alpha marks without a license, to which Russell apparently did not object. Paddle Tramps claims that this conversation, combined with the subsequent business dealings between the two entities, constituted acquiescence.

Regarding the remaining Greek Organizations, Paddle Tramps asserts that the lack of action amounts to implicit assurances that induced reliance by Paddle Tramps. Paddle Tramps specifically noted the pattern of writing letters expressing the Greek Organizations' concerns and demands to stop infringement throughout the 1990s and 2000s, but in which no legal action was taken until 2008. Paddle Tramps claims that this unreliable pattern of failing to follow up on threats induced reliance on its part in giving it the impression that it would not be subject to legal action.

The Greek Organizations argue that all of these actions only serve to create implied licenses, which were revoked upon the Greek Organizations' protests. The Greek Organizations point to Kenneth Abraham's testimony, in which he acknowledged that Paddle Tramps had never received explicit permission from the Greek Organizations to use their marks. Rather than directly producing other factual evidence, however, the Greek Organizations argue that, as a matter of law, even if they have acquiesced to Paddle Tramps's infringement, the implied acquiescence in this case created only a revocable license that was revoked upon the Greek Organizations' protests, cease and desist letters, and ultimate filing of claims against Paddle Tramps.

Because the Greek Organizations do not challenge the merits of the acquiescence defense, and because the factual assertions regarding Delta Delta Delta

and Pi Kappa Alpha's actions do not appear to be in dispute, the Court is of the opinion that there is no genuine issue of material fact as to the merits of the acquiescence defense. However, it is important to note that "acquiescence is a personal defense which merely results in the loss of rights against one defendant," not every possible defendant. *Exxon Corp.*, 109 F.3d at 1075 n. 7 (quoting *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir.1984)). The specific acts of encouragement or implicit approval undertaken by certain individual Greek Organizations will be relevant to the Court's considerations in fashioning a proper equitable remedy. Of course, as noted above, these determinations may be irrelevant if a jury decides that Paddle Tramps possesses unclean hands, which would bar them from asserting the defenses of laches and acquiescence. For the time being, however, the Court shall not grant summary judgment on the merits of these defenses. The most important considerations in regard to acquiescence (and, to a lesser extent, laches as well) relate to the Greek Organizations' contention that even if there was acquiescence in this case, they are still entitled to injunctive relief as a matter of law. The Court will address this issue in the next section of this Order.

## V. Remedies

Having determined that there are genuine issues of material fact surrounding both whether Paddle Tramps possesses unclean hands and, if not, whether laches and acquiescence apply to this case, the Court now moves to the issue of remedies. The Greek Organizations argue that even if laches and acquiescence apply to this case, while their access to damages may be barred, they are still entitled to injunctive relief. Paddle Tramps argues that in the face of a finding of laches and acquies-

cence, the Greek Organizations should be barred from all relief, monetary or injunctive. Having considered the parties' arguments, it is the opinion of the Court that a finding of laches or acquiescence should not act to bar the Greek Organizations from seeking injunctive relief, but the Court's ultimate fashioning of a remedy will be dependent upon the jury's findings.

■ The Supreme Court and courts in this district have long held that a delay of filing suit does not necessarily mean that the party asserting its trademark rights is barred from obtaining injunctive relief. "Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, it lasts no longer than the silence from which it springs. It is, in reality, no more than a revocable license." *Menendez*, 128 U.S. at 524, 9 S.Ct. 143; *see also Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984). The Fifth Circuit has held that a finding of laches alone will not foreclose a trademark owner's request for injunctive relief, though it would foreclose a trademark owner's demand for an accounting or damages. *Conan Props.*, 752 F.2d at 152. Unreasonable delay in filing suit has been viewed by the Fifth Circuit as creating a revocable license which is revoked once the trademark owner objects to the other party's infringement. *Id.* (citing *Menendez v. Holt*, 128 U.S. 514, 524, 9 S.Ct. 143, 32 L.Ed. 526 (1888)). Thus, "[m]ere delay in bringing suit does not affect the right to an injunction against further use of an infringed trademark." *American Hosp. Ass'n v. Bankers Commercial Life Ins. Co.*, 275 F.Supp. 563, 565 (N.D.Tex.1967) (Hughes, J.).

■ Ultimately, it is clear to the Court that even if the jury finds laches and acquiescence on the part of the Greek Organizations, the law does not foreclose injunctive relief. As one commentator noted, "only in the most exceptional circumstances will injunctive relief be denied in a case of deliberate infringement." McCARTHY ON TRADEMARKS § 31:9 (quoting *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 614–15 (7th Cir.1965)). Instead, the Court may decide that injunctive relief is appropriate after taking into account the equitable considerations that apply to the case. For example, in *Ironclad*, Judge Solis noted, "Although courts routinely grant injunctive relief in trademark actions, courts are free to balance the interests of the parties and the particular circumstances of the case when determining the appropriateness of the requested remedy." *Ironclad, L.P. v. Poly–America, Inc.*, No. 3:98–CV–2600, 2000 WL 1400762, at *10 (N.D.Tex. July 28, 2000) (Solis, J.). Importantly, Judge Solis noted that "[m]isconduct by the plaintiff, such as laches and acquiescence, *may justify* a court's denial of injunctive relief." *Id.* (emphasis added). Contrary to Paddle Tramps's assertions, a finding of laches and acquiescence does not require the Court to bar injunctive relief. The facts and circumstances of such a finding are certainly relevant to the Court's ultimate determination of what remedy is appropriate, but, as a matter of law, the Court may still grant injunctive relief to the Greek Organizations even if they were guilty of laches and acquiescence. As one prominent treatise has provided,

> [I]n general, laches will bar a plaintiff's recovery for past damages but will not impede its relief from future violations. Courts have granted injunctions even after delays of over twenty years on the ground that, whatever the respective rights of the parties, the public must be protected from the use of confusingly similar trademarks. Trademark infringement is a continuing wrong that gives rise to a claim for relief as long as the infringement persists; thus, a plaintiff may be entitled to injunctive relief as

long as the infringement persists; thus, a plaintiff may be entitled to injunctive relief as well as those damages incurred after the suit was filed. Courts have recognized that, in egregious circumstances such as an extraordinarily long delay, there will be rare cases that require denial of all relief.

3–11 GILSON ON TRADEMARKS § 11.08.

Accordingly, in a trademark infringement case such as this, where the Court may be tasked with fashioning an appropriate equitable remedy, the Court must balance a number of equitable considerations. *See Dwinell–Wright v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir.1943) (in a trademark case, noting that "equity does not seek for general principles, but weighs the opposed interests in the scales of conscience and fair dealing"). In discussing these factors, one treatise explained,

> Although there is no formula or magic number of years that determines whether an injunction should be granted, courts consider certain especially important factors in arriving at their decisions, including any likelihood on confusion from the defendant's actions and whether the defendant intentionally infringed on the plaintiff's mark. Unexcused delay plays a vital role in preliminary injunction decisions as well.... [T]here may be some special circumstances that will convince a court that a plaintiff has not acted quickly enough to merit injunctive relief.

3–11 GILSON ON TRADEMARKS § 11.08.

Because of the need to balance the equities in this case, the Court declines to accept Paddle Tramps's argument that Judge Johnson's decision in *Birney*, 2000 WL 33538621, "supports the denial of all relief," monetary or injunctive. Pl.'s Supp. Br., Docket No. 79, at 4. In *Birney*, the plaintiff possessed a trademark for the term "theGalleria" that had been used since 1970 to describe commercial real estate enterprises. The mark was registered in 1972. The defendant began using the name "Galleria Oaks" in 1978 for a condominium complex that was near "theGalleria" commercial real estate development. In *Birney*, much like in this case, Paddle Tramps ignored a series of cease and desist letters, and the plaintiff finally brought suit approximately 20 years after the first cease and desist letter. The Court held that the plaintiff had possessed knowledge of the use of its trademark for over 15 years prior to filing suit, and held the claims were barred by laches and equitable estoppel. The Court also barred an injunction because there had been no expansion of services by the defendant and no expanded use of the mark after receipt of the cease and desist letter.

The Court declines to follow the result of *Birney* for two reasons. First, *Birney* does not, as Paddle Tramps suggests, stand for the proposition that a finding of laches or acquiescence must defeat any kind of relief. Instead, the court held that "equitable defenses *can defeat* prospective injunctive relief." *Id.* at *10 (emphasis added). Second, and more importantly for the purposes of this case, there are multiple equitable considerations that the Court must take into account that were not present in *Birney*. As the Court shall discuss further below, a decision regarding the appropriateness of injunctive relief despite findings of laches and acquiescence will require the Court's consideration of the nature of the infringement in this case (which is more direct and likely to cause confusion than in *Birney*), Paddle Tramps's intent, and other factors. While it is true that *Birney, Tillamook,* and other cases cited by Paddle Tramps barred injunctive relief in cases of extensive delay like that seen in this case, the equitable considerations that the Court must take into account in this case are unique, and

require the Court to take a different approach and balance the competing interests that are present in this case. *See Dwinell–Wright,* 132 F.2d at 825–26 (listing various interests that must be balanced in case involving use of a mark in the same market).

■ Having examined the evidence and arguments presented to the Court, it is clear that a number of equitable considerations weigh in favor of Paddle Tramps, while others weigh in favor of the Greek Organizations. For example, the fact that the Greek Organizations delayed for decades in asserting their rights weighs against their attempt to halt Paddle Tramps from continuing with its current business practices. *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 265 (5th Cir.1980) ("A trademark owner that strongly believed its customers were being deceived would hardly have remained idle for such an extended period of time."). Additionally, Paddle Tramps asserts that it continued to build and develop its business in the face of letters and threats of legal action from the Greek Organizations that were not followed up on, the Greek Organizations' ignoring Paddle Tramps's infringement, and in some cases outright encouragement of its business by individual Greek Organizations. *See Conan Props.,* 752 F.2d at 152 (allowing a restaurant's business to continue when a representative of the mark owner had explicitly approved of the restaurant's use of the mark at that location). Such equitable factors weigh in favor of Paddle Tramps.

On the other hand, the fact that Paddle Tramps's infringement involves the use of identical marks used in the very same field and market as properly licensed products weighs in favor of the Greek Organizations. *See Kason Indus.,* 120 F.3d at 1207 ("[I]f the likelihood of confusion is inevitable, or so strong as to outweigh the effect of the plaintiff's delay in bringing a suit, a

court may in its discretion grant injunctive relief, even in cases where a suit for damages is appropriately barred."). The nature of this infringement in this market brings the public's interest in avoiding confusion into account, which also weighs in favor of the Greek Organizations. *See Angel Flight of Ga., Inc. v. Angel Flight of Am., Inc.,* 522 F.3d 1200, 1208 (11th Cir. 2008) (" 'When inevitable confusion occurs in the marketplace due to unrestricted dual use of a trademark, the paramount value of the public interest demands some adjustment to the status quo,' even in cases involving acquiescence.") (quoting *SunAmerica Corp. v. Sun Life Assur. Co. of Canada,* 77 F.3d 1325, 1337 (11th Cir. 1996)); *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P. C.,* 314 F.3d 62, 68 (2d Cir. 2002) ("Given the strong interest in preventing public confusion ..., a plaintiff's apparent acquiescence or delay in bringing suit does not necessarily bar relief."); *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir.1976) (noting that in trademark cases, "[a] third party, the consuming public, is present and its interest are paramount"); McCarthy on Trademarks § 31:10 ("If it is inevitable that a significant amount of confusion will probably be created by the junior user's actions, then the right of the public not to be confused and deceived may outweigh the inequity to the junior user of the trademark owner's delay in suing.").

However, there is at least one other equitable factor that the Court must consider about which there is a factual dispute: the intent of the infringer. *See* 3–11 Gilson on Trademarks § 11.08 (noting that "whether the defendant intentionally infringed on the plaintiff's mark" is "especially important" to courts in determining whether an injunction should be granted). As noted above, the Court is of the opinion that there is a genuine issue of material

fact regarding Paddle Tramps's intent. The jury's determination on Paddle Tramps's intent, including what it was at the time of its founding, and whether it developed into an impermissible intent at any time later in its existence, will be very important in the Court's balancing of the equities in this situation. This dovetails with the related important consideration of when Paddle Tramps became aware of the Greek Organizations' trademark rights, and what its actions were after that time. *See Elvis Presley,* 141 F.3d at 205 ("Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts."). These facts, which vary between the Greek Organizations, will have an important impact on the Court's balancing of the equities in fashioning a remedy.

Furthermore, there are certain individual Greek Organizations about which individual factual determinations may be necessary to fashion appropriate relief. For example, there are indications that different Greek Organizations became aware or should have become aware of Paddle Tramps's infringement at different times. Furthermore, some Greek Organizations had individual dealings with Paddle Tramps that could amount to explicit acquiescence or even encouragement of Paddle Tramps's infringing behavior. A jury's ultimate determination regarding these facts will likely have an impact on the terms of the equitable remedy that the Court may fashion. As the Fifth Circuit noted,

> [C]ourts construe the plaintiff's unreasonable delay to imply consent to the defendant's conduct, which amounts to nothing more than a revocable license; the license is revoked once the plaintiff objects to the defendant's infringement. In cases where the defendant *actually relies* upon the plaintiff's *affirmative act,* however, *the fiction of implied consent is inapplicable and an injunction may not issue.*

*Conan Props.,* 752 F.2d at 152 (emphasis added) (citations omitted). There are disputed facts regarding the actions of individual Greek Organizations that will, upon being considered by a jury, impact the Court's ultimate decision.

The Court finds further guidance from commentary on the issue in Professor McCarthy's seminal treatise. In discussing cases in which an injunction was denied when there was a finding of laches, Professor McCarthy notes that in many of these decisions "there were some plus factors in addition to mere delay and resulting prejudice." MCCARTHY ON TRADEMARKS § 31:7. Such factors include (1) delay during which the mark passed into usage as a generic name, (2) a grossly long period of delay, (3) dubious proof of likelihood of confusion, (4) plaintiff had only dubious title to the mark, (5) business dealings between the parties amounting to a implied consent to use, and (6) defendant's good faith development of a specific territorial area. *Id.* (citations omitted). At least two of these factors come into play in this case. First, it is clear that the lengthy delay in asserting their rights weighs against Paddle Tramps. Second, the existence of previous business dealings between Paddle Tramps and certain Greek Organizations, such as Delta Delta Delta, could impact the Court's decision on injunctive relief. However, the actions and relationships between certain Greek Organizations and Paddle Tramps involve certain disputed issues of material fact; accordingly, disposition of this issue prior to a jury's consideration of the issues of fact in this case would be inappropriate.

The Court reaches a similar conclusion as to acquiescence. Of course, the factual differences between each of the Greek Organizations' relationships with

Paddle Tramps will be relevant, such as the facts surrounding Delta Delta Delta. However, for the vast majority of the Greek Organizations, Paddle Tramps only argues that they provided implicit assurances by their silence and refusal to take action. Such circumstances may not be sufficient to bar injunctive relief. "Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, it lasts no longer than the silence from which it springs. It is, in reality, no more than a revocable license." *Menendez*, 128 U.S. at 524, 9 S.Ct. 143; *see also Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984). The Greek Organizations' lack of action in the face of infringement indicates tolerance of the use of the marks, but not approval. Unlike in *Conan Properties*, most of the Greek Organizations did not expressly approve of a type of use of their marks; instead, they merely did nothing in the face of their use until they were organized or were attempting to gain control of their marks' use. *Compare Conan Props.*, 752 F.2d at 152 (noting that an individual owner's positive statements regarding infringing use of the mark provided the implicit or explicit assurance necessary to foreclose injunctive relief). Upon attempts to stop use of or enforce their marks, the Greek Organizations revoked the implied license established by their silence; accordingly, the Court's consideration of injunctive relief would be appropriate regardless of the availability of the defense. *See Menendez*, 128 U.S. at 524, 9 S.Ct. 143; *Conan Props.*, 752 F.2d at 152–53 (holding injunctive relief to be appropriate for use that mark-owner acquiesced to but not for infringement that took place after receipt of a cease and desist letter). However, whether the length of the delay, prejudice to Paddle Tramps, or other equitable considerations weigh in favor of permitting Paddle Tramps to continue its behavior cannot be determined until a jury considers the disputed issues of fact in this case.

## Conclusion

Having carefully considered the issues and the facts of this case, this appears to be a very unique case requiring careful judicial consideration of the issues before the Court, including whether Paddle Tramps possesses unclean hands and the facts surrounding the merits of laches and acquiescence, and the ultimate relief that is available in this case. Additionally, while the fashioning of injunctive relief is within the Court's discretion, the elements that the Court must consider are heavily dependent upon disputed issues of fact. Accordingly, the Court believes that numerous issues surrounding the factual background of this litigation should be submitted to a jury.

Having already determined that Paddle Tramps committed infringement and dilution, the jury will be given three overarching tasks. First, the jury must determine whether Paddle Tramps and its founder, Kenneth Abraham, possessed the bad faith intent necessary to bar the assertion of equitable defenses. Second, if Paddle Tramps can access equitable defenses, the jury shall determine facts relevant to whether Paddle Tramps has met its burden of proving that laches and acquiescence apply to this case. The third task shall be to determine issues of fact that will be relevant to the Court's ultimate determination of what relief is appropriate in this case. The nature of this final task shall become more concrete closer to trial when the parties submit questions to the jury requesting findings of fact. While some issues, such as Paddle Tramps's intent at various stages of its existence, when the Greek Organizations became aware or should have become aware of the claims, and whether the Greek Organiza-

tions explicitly or implicitly approved of Paddle Tramps's infringement, will almost certainly be raised in regard to the first two tasks, the Court will permit the parties to ask for specific findings of fact that will assist the Court in ultimately fashioning a remedy in this case.

Where a unique set of facts "presents a strong weight of equities in the junior user's favor," it is "clear that there can be situations where estoppel by laches will bar injunctive relief." McCarthy on Trademarks § 31:3. The circumstances of this case may present such a situation, and the Court's ultimate resolution of this matter will strongly depend on the jury's findings of fact. Accordingly, Paddle Tramps's Motion for Summary Judgment as to its defenses of laches and acquiescence is DENIED.

It is further ORDERED that the following dates control the disposition of this action. The deadline for any initial designation of expert witnesses and reports shall be July 28, 2011. Any responsive designation of expert witnesses and reports shall be filed by August 11, 2011. The deadline for the parties to file a joint pretrial order, motions in limine, and proposed jury instructions or proposed findings of fact and conclusions of law shall be August 22, 2011. The pretrial conference is set for August 29, 2011 at 2:00 p.m. Trial is scheduled for September 12, 2011 at 9:00 a.m.

IT IS SO ORDERED.